IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Signature Styles, LLC,[1] *et al.*, | ) | Case No. 11-_____ (___) |
| a Delaware limited liability corporation, | ) | |
| | ) | Joint Administration Pending |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF ROBERT ANGART IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Robert Angart, being duly sworn, deposes and says:

1. On June 6, 2011 (the "**Petition Date**"), Signature Styles, LLC and Signature Styles Gift Cards, LLC (collectively, the "**Debtors**") each commenced a case under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Court**"). I am the Chief Restructuring Officer of the Debtors and am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1109 of the Bankruptcy Code.

3. I submit this Declaration (the "**Declaration**") to assist the Court and the other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases (the "**Cases**") and in support of the first day motions and applications filed in these Cases (the "**First Day Motions**"). Except as otherwise indicated, all facts set forth in

[1] The Debtors in these chapter 11 cases, and the last four digits of each tax identification number, and their respective case numbers are: Signature Styles, LLC (4502) (Case No. ________) and Signature Styles Gift Cards, LLC (8699) (Case No. __________). The location of the Debtors' corporate headquarters is: 711 Third Avenue, 4th Floor, New York, New York 10017.

this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtors. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

4. This Declaration is divided into two sections. Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the liquidity events giving rise to these Cases. Section II sets forth those facts that are most germane to this Court's determination of the Debtors' various motions for first day relief and is intended to supplement any other declarations or affidavits submitted in direct support of such motions.

## I. BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A. General Background and History

**5.** Signature Styles, LLC ("**SSL**") was formed on June 4, 2009 under the provisions of the Delaware Limited Liability Company Act. SSL is based in New York, New York and is a catalog and internet retailer specializing in women's apparel and accessories. SSL operates under three different product lines: Spiegel, Newport News and Shape Fx. SSL's wholly-owned subsidiary, Signature Styles Canada Corp., a non-debtor, was formed on June 11, 2009 under the provisions of the Canada Business Corporations Act and operates a call center in New Waterford, Nova Scotia. SSL's other wholly-owned subsidiary, Signature Styles Gift Cards, LLC ("**SS Gift Cards**" and, together with SSL, the "**Debtors**"), was formed on June 8,

2009 under the provisions of the Virginia Liability Company Act to service gift card transactions.

6. The Spiegel brand has lived through many different incarnations since its Civil War-era founding, persevering through the challenges of the Great Chicago Fire, the Great Depression, and two world wars. Founded in downtown Chicago, the Debtors are now a catalog and internet specialty retailer. The internet has become the company's preferred shopping and transaction channel, with on-line purchases now accounting for approximately 75% of the Debtors' total sales.

## B. Products

The Debtors offer three primary brands of products, including:

7. **Spiegel**. Offers female customers a simple and unique "Luxury Shopping Experience" that allows each customer to create a style that is her own. Through Signature Luxury Fabric Collections, Spiegel offers exquisite fabrics, flattering fits and timeless silhouettes that easily mix and match to create a luxurious and versatile wardrobe foundation.

8. **Newport News**. In 2003, Newport News became the first woman's catalog to adopt the editorial look and styling of fashion magazines. In 2007, its brand positioning was further refined in an effort to strengthen the brand's affinity and loyalty by fusing the catalog's traditional focus upon "Glamour and Romance" with a more tightly edited focus. Today, Newport News is positioned to offer products in print and online that feature the latest in romance and glamorous trends, adapted to fit each customer's lifestyle and price.

9. **Shape Fx**. Founded as a sub-brand of Newport News, Shape Fx was created to offer body-enhancing apparel and each female customer an individualized shopping experience, allowing her to shop by figure type or target zone while receiving more detailed,

benefit-focused product views and expert tips on style. Every Shape Fx collection piece integrates at least one of the three exclusive approaches to custom figure perfection: built-in control, exclusive fabrication and strategic design.

**10.** Prior to the Petition Date, the Debtors employed approximately 133 individuals in the United States. The Debtors are not party to any collective bargaining agreements.

## C. SSL'S Acquisition of the Spiegel Brand

**11.** SSL was formed in June 2009 to acquire the assets of Spiegel Brands, Inc. and certain of its affiliates (collectively, "**Spiegel Brands**") at a foreclosure sale conducted by Dymus Funding Company, LLC, in its capacity as Collateral Agent for the lenders under a Financing Agreement dated as of August 18, 2006 by and among Dymus, as collateral agent, Spiegel Brands, as borrowers or guarantors, Wells Fargo Retail Finance, LLC, as lender and administrative agent, and the other lenders party thereto. The foreclosing lenders, through their investment banker, had conducted a robust marketing process for the Spiegel Brands' assets, but SSL was the only party that ultimately submitted a bid for the assets. SSL acquired substantially all of Spiegel Brands' assets for a purchase price of $21.7 million.

## D. Debt Structure and Ownership

**12.** The Debtors' capital structure is comprised of (i) a term loan (the "**Term Loan**") provided by Zohar III, Limited; and (ii) a secured revolving credit facility (the "**Revolver**" and together with the Term Loan, the "**Loans**") provided by Zohar II 2005-1 Limited and Zohar III, Limited (together, the "**Pre-Petition Lenders**"). The Pre-Petition Lenders are investment funds managed by companies whose collateral manager is related to Patriarch Partners Agency Services, LLC ("**PPAS**"). The Loans were made pursuant to that

certain Credit Agreement dated as of June 12, 2009 (the "**Pre-Petition Credit Agreement**") by and among SSL, as borrower, SS Gift Cards, as guarantor, the Pre-Petition Lenders, as lenders, and PPAS, as administrative agent. The Loans are secured by liens granted to PPAS, as administrative agent, on substantially all of the Debtors' assets, including all equipment, inventory, security collateral, accounts receivable, account collateral and intellectual property.

**13.** As of the Petition Date, the outstanding balance including accrued interest under the Revolver totaled approximately $14.60 million and under the Term Loan totaled approximately $22.64 million. As of the Petition Date, there were also letters of credit outstanding of approximately $4,000.00 under the Revolver.

**14.** As of April 30, 2011, the Debtors' unsecured debt, excluding obligations under real and personal property lease obligations, totals approximately $35.3 million, including approximately $9.8 million of trade debt, $135,000 owed to Patriarch Partners Management Group, LLC for management fees and expenses, approximately $23.2 million owed to customers for returns, credits and gift cards, approximately $313,000 of accrued payroll and benefits, and approximately $255,000 of accrued taxes and other accrued liabilities.

**15.** The ownership of the Debtors is comprised of two classes of membership interests: common limited liability company interests and Series A preferred limited liability interests. Both the common and the preferred interests in the Debtors are 100 percent owned by Zohar III, Limited. The Series A preferred limited liability interests are secured by a second lien on substantially all of the Debtors' assets.

**16.** The Debtors are also parties to a variety of real and personal property leases, including a 20-year lease for a distribution facility and administrative facilities located in

the State of Virginia. Total obligations under that lease, which is the only one treated as a capital lease, are approximately $14.0 million.

## E. Management

**17.** In May 2011, a new management team was put in place to assess the Debtors' managerial and financial difficulties and take corrective action. The team is led by Elaine Sugimura, the Chief Executive Officer, and Kevin Frain, the Chief Financial Officer. Once it became apparent that appropriate corrective action to the business operations could not be successfully effectuated outside of bankruptcy, on May 9, 2011, the Debtors retained Robert Angart as Chief Restructuring Officer. Mr. Angart has primary responsibility for managing the Debtors during these Chapter 11 cases and reports directly to the Debtors' Board of Managers.

## F. Events Leading to Debtors' Chapter 11 Cases

**18.** **Financial Performance.** As a result of the overall decline in the retail market during the past several years, the Debtors experienced a reduction in sales and lower than expected revenues. The Debtors believe that, while their products remain competitive in the market, they need to restructure their business operations to align the company's costs with current retail consumer demand and significantly reduce their liabilities.

**19.** The Debtors' fiscal year runs on a calendar basis. For the year 2010, the Debtors had net sales of $119.9 million, losses from operations of $25.6 million and net income of negative $31.1 million. For the three months ending March 31, 2011, the Debtors' net sales were $10.8 million, operating losses were $3.4 million and net income was negative $5.0 million. For the year 2010 and three months ended March 31, 2011, the Debtors were unable to generate sufficient Earnings Before Interest Taxes Depreciation and Amortization ("**EBITDA**") to cover their interest expense.

20. As of the Petition Date, the Debtors' books and records reflected approximately $48.6 million of assets and approximately $87.6 million in liabilities. The Debtors were obligated on approximately $35.87 million of secured debt and approximately $1.37 million of accrued interest on such debt. The Debtors have capital lease obligations of approximately $14.0 million.

21. **Liquidity Crisis.** As a result of the softening in the retail market, the Debtors needed access to additional funds. Through a series of amendments entered into over the last two years, the Pre-Petition Lenders agreed to increase the available commitment under the Revolver from the original $5 million to $17 million as of the Petition Date. As of April 30, 2011, the Debtors had nearly exhausted the Revolver, which had an outstanding balance of approximately $16.5 million, although this amount was reduced to approximately $14.075 million as of the Petition Date. The Debtors did not make several required monthly interest payments under the Term Loan and, as a result, events of default exist under the Pre-Petition Credit Agreement. Because the Debtors had not cured these events of default prior to the Petition Date, the Pre-Petition Lenders have no further obligation to make advances under the Pre-Petition Credit Agreement, and, in fact, were unwilling to provide any further prepetition funding to the Debtors. The Debtors' decreasing revenues and ensuing losses drained their cash resources and limited their ability to ship catalogs or purchase adequate inventory. These handicaps spurred additional sales declines, which further aggravated the Debtors' cash constraints. As of the Petition Date, the Debtors had approximately $50,000 in cash on their books.

22. **Turnaround Initiatives.** To combat the softening in the retail market, the Debtors attempted to aggressively cut operating costs. As part of that effort, the Debtors reduced

their workforce from 216 employees to 133. Although recently implemented, these cost-cutting strategies will not be sufficient to restore the Debtors to profitability. The Debtors continue to carry significant legacy liabilities, including leases for warehouse and office space considerably larger than the Debtors actually need. The Debtors' reduced level of operations can simply no longer support their liabilities.

**23. The Chapter 11 Filing and the Proposed Sale Process.** The Debtors are overleveraged and unable to sustain business operations. Accordingly, the Debtors have determined that a sale of substantially all of their assets is in the best interests of all stakeholders because it will maximize the value of the Debtors' assets. To initiate an appropriate sale process, the Debtors authorized the filing of these bankruptcy cases and entered into a stalking horse agreement with an acquisition entity formed by the Pre-Petition Lenders.

**24.** As set forth in the Debtors' motion for an order authorizing, among other things, the sale of substantially all of the Debtors' assets, filed concurrently herewith, the Debtors desire to pursue an orderly sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code on an expedited basis. In that regard, the Debtors have already commenced a marketing process and begun soliciting additional potential bidders for the Debtors' assets. In particular, to assist in the marketing and sale of the Debtors' assets, the Debtors retained Western Reserve Partners LLC ("**Western Reserve**"), a Cleveland based investment banking firm with substantial experience in sell side representations of middle market companies. Since their retention prior to the Petition Date, Western Reserve has contacted approximately 15 potential bidders and identified more than 100 candidates that might potentially have an interest in acquiring the Debtors' assets. Moreover, the Debtors have proposed detailed bidding procedures for the accommodation of additional bids in their motion

for an order approving, among other things, bidding procedures for the sale of substantially all of their assets and certain bidding protections, filed concurrently herewith.

**25.** In light of the Debtors' financial distress, the Debtors will be seeking a shortened period in which interested parties may submit bids for the Debtors' assets. If the Debtors do not receive additional bids within this period, the Debtors will request that the Court authorize the Debtors to consummate the sale transaction contemplated by the stalking horse agreement within approximately 60 days of the Petition Date. Whether the Debtors' assets are ultimately sold to the stalking horse bidder or another bidder, however, the Debtors believe that the sale process will generate the highest and best value for all stakeholders. The process will also result in a continuation of the Debtors' business and preserve more than 100 jobs.

## II.
## PLEADINGS

**26.** Concurrently with the filing of their Cases, the Debtors filed a number of first day motions. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' Cases (the "**First Day Hearing**"), at which time the Court will hear the First Day Motions.

**27.** Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible through a sale of substantially all of the Debtors' assets; (b) maintaining the confidence and support of the Debtors' customers, employees, and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these Cases. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful

reorganization. I also believe that the matters addressed in the First Day Motions are of a genuinely emergent nature, and that the relief requested in the First Day Motions is required to preserve the assets of the Debtors' estates and to maintain the Debtors' ongoing business operations. Moreover, I believe, as further described below, that the failure to immediately address the issues set forth in the First Day Motions will have extremely adverse effects on the Debtors, their estates, and their creditors.

## B. Motion for Entry of an Order Authorizing Joint Administration of the Debtors' Related Chapter 11 Cases

**28.** Both Debtors have a case pending before this Court. The Debtors are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code, and their operations are closely related. I believe that joint administration of these Cases is warranted and will ease the administration burden for the Court and the parties involved with these Cases.

**29.** I believe that jointly administering these related Cases will prevent duplication of effort and unnecessary fees, will not prejudice any party, and is in the best interests of the Debtors, their estates, and all creditors that the Debtors' Cases be jointly administrated for procedural purposes. The Debtors anticipate that numerous notices, applications, motions, hearings, and orders in these Cases will affect both Debtors. The failure to administer these Cases jointly would result in the filing of duplicative pleadings for each issue that arises in these Cases, and the service of each of these duplicative pleadings on numerous overlapping service lists. Joint administration of these Cases will eliminate these cumbersome filings and reduce the waste and burden on judicial resources associated with the administration of the Cases. Joint administration will also reduce the also reduce the burden on the United States Trustee in supervising these Cases. I believe that the relief requested in this motion will

not adversely affect creditors' rights, as this motion requests only administrative, and not substantive, consolidation of the Debtors' Cases.

## C. Motion for Entry of an Order Extending Time for Debtors to File Their Schedules of Assets and Liabilities and Statements of Financial Affairs

**30.** The Debtors filed their consolidated Creditors List on the Petition Date. The Creditors List in these Cases includes approximately 300,000 creditors.

**31.** Due to the size of the Debtors' business and relative complexity of the creditor and vendor relationships of the Debtors, the Debtors will be unable to complete their schedules of assets and liabilities ("**Schedules**") and statements of financial affairs ("**SOFAs**") by July 6, 2011. Given the substantial burdens already imposed on the Debtors' management by the commencement of these Cases, the limited number of employees available to collect the information, the competing demands upon such employees, and the time and attention that the Debtors must devote to the restructuring process, I believe that there is "cause" to extend the deadline to file the Schedules and SOFAs by approximately one week, through and including July 15, 2011.

**32.** I believe that the requested extension will enhance the accuracy of the Debtors' Schedules and SOFAs and avoid the necessity of substantial subsequent amendments.

## D. Application of Debtors for an Order Authorizing the Retention of Epiq Bankruptcy Solutions, LLC as Official Claims, Noticing, and Balloting Agent as of the Petition Date

**33.** Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Bankruptcy Rule 2002-1(f), the Debtors request entry of an order authorizing them to employ and retain Epiq Bankruptcy Solutions, LLC ("**Epiq**") as claims, noticing, and balloting agent (the "**Claims Agent**") in these Cases, as of the Petition Date, pursuant to the terms and conditions set

forth in the engagement agreement between the Debtors and Epiq dated May 25, 2011, and attached to the application as Exhibit B (the "**Services Agreement**").

**34.** The Debtors have thousands of creditors, potential creditors, and parties in interest to whom certain notices will be sent. I believe that the size of the Debtors' creditor body makes it impracticable for the Clerk of the Court (the "**Clerk**") to undertake, without assistance, the task of sending notices to creditors and other parties in interest.

**35.** In consideration of the number of anticipated claimants and other parties in interest, the nature of the Debtors' businesses, and the scope of the tasks for which the Debtors will require the assistance of a claims noticing and balloting agent, I respectfully submit that the appointment of Epiq is in the best interests of the Debtors' estates, their creditors, parties in interest, and this Court. I believe that Epiq's assistance will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts.

**36.** Based on Epiq's considerable experience in providing similar services in large chapter 11 cases, I believe that Epiq is qualified to serve as Claims Agent in these Cases. I believe that parties to these Cases will benefit as a result of Epiq's experience and cost-effective methods.

**37.** Epiq has advised the Debtors of its willingness to perform the above-described services in accordance with the terms of the Services Agreement and the guidelines promulgated by the Judicial Conference of the United States for the implementation of 28 U.S.C. § 156(c).

**38.** Epiq's compensation is set forth in the Services Agreement. The Debtors respectfully submit that such compensation is reasonable in light of the services to be performed

by Epiq as Claims Agent. Furthermore, the Debtors request authorization to compensate Epiq for services rendered as detailed in the application. For all of the foregoing reasons, I believe that the retention of Epiq as Claims Agent is appropriate and in the best interests of the Debtors, their estates and their creditors.

## E. Application of Debtors Pursuant to 11 U.S.C. § 327(A) for Authority to Employ and Retain Polsinelli Shughart PC as Counsel to the Debtors *Nunc Pro Tunc* to the Petition Date

**39.** I believe that continued representation by POLSINELLI SHUGHART PC ("**Polsinelli**") is critical to the Debtors' efforts to effect a successful sale of the Debtors' assets because Polsinelli is extremely familiar with the Debtors' businesses and legal and financial affairs and, accordingly, is well-suited to guide the Debtors through the chapter 11 process.

**40.** The Debtors desire to employ Polsinelli under a general retainer because of the extensive legal services that will be required in connection with the businesses of the Debtors and their affiliates. I believe that the services of attorneys under a general retainer are necessary to enable the Debtors to execute faithfully their duties as debtors in possession. I also believe that the Retainer (defined in the application) reflect normal business terms in the marketplace.

**41.** Other than as set forth above and in the Ward Declaration (as defined in the application and attached to the application as Exhibit A), no arrangement is proposed between the Debtors and Polsinelli for compensation to be paid in these Cases and no agreement or understanding exists between Polsinelli and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with these Cases.

**42.** I believe, and the Debtors submit that the engagement and retention of Polsinelli on the terms and conditions set forth herein and in the Ward Declaration and the

Engagement Agreement (as defined in the application and attached to the Ward Declaration) is necessary and in the best interests of the Debtors, their estates, and their creditors.

### F. Application of Debtors to Retain and Employ Wickwire Holm as Canadian Counsel *Nunc Pro Tunc* to the Petition Date

**43.** I believe that representation by Wickwire Holm ("**Wickwire**") is necessary in this case because SSL's wholly-owned subsidiary, Signature Styles Canada Corp., a non-debtor, was formed on June 11, 2009 under the provisions of the Canada Business Corporations Act and, as of the Petition Date, operates a call center in New Waterford, Nova Scotia, Canada. More than half of the Debtors' employees are employed in Nova Scotia, and the Debtors' operations in Canada require competent Canadian counsel to navigate these bankruptcy proceedings. The Debtors desire to employ Wickwire under a general retainer because of the extensive legal services that will be required in connection with the businesses of the Debtors and their affiliates. I believe that the services of Wickwire under a general retainer are necessary to enable the Debtors to execute faithfully their duties as debtors in possession. I also believe that the Retainer (defined in the application) reflect normal business terms in the marketplace.

**44.** Other than as set forth above and in the Holm Declaration (as defined in the application and attached to the application as Exhibit A), no arrangement is proposed between the Debtors and Wickwire for compensation to be paid in these Cases and no agreement or understanding exists between Wickwire and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with these Cases.

**45.** I believe, and the Debtors submit that the engagement and retention of Wickwire on the terms and conditions set forth herein and in the Holm Declaration is necessary and in the best interests of the Debtors, their estates, and their creditors.

## G. Application of Debtors to Retain and Employ Western Reserve as Investment Banker *Nunc Pro Tunc* to the Petition Date

**46.** I believe that representation by Western Reserve ("**Western**") as investment banker is necessary in these Cases. I believe that the compensation arrangements contained in the Engagement Letter (as defined below) inure to the benefit of the Debtors' estates as they provide the proper inducement for Western to act expeditiously and prudently with respect to the matters for which it will be employed.

**47.** In connection with the chapter 11 filing, the Debtors executed an engagement letter with Western, dated June 1, 2011 (the "**Engagement Letter**"). The engagement will require Western to act as the Debtors' exclusive investment banker with respect to, *inter alia*, evaluating potential sales of the Debtors' assets (a "**Sale Transaction**") and other strategic alternatives. Western is familiar with the books, records, financial affairs, and other data maintained by the Debtors and is well qualified to continue to provide such services to the Debtors. Further, I believe that Western is familiar with the Debtors' capital structure and agreements and many of the potential financial and legal issues that may arise in the context of these Cases. Western is uniquely situated to assist the Debtors, and Western's experience in the restructuring of troubled companies will serve the Debtors' well in these Cases. Accordingly, I believe that retaining Western is an efficient and cost effective manner in which the Debtors may obtain necessary financial advisory and investment banking services.

**48.** As compensation for Western's services, the Debtors have agreed to pay Western in accordance with the Engagement Letter, and as summarized in the application. I believe that the fee structure outlined in the Engagement Letter and summarized in the application is consistent with the typical arrangement Western and other firms enter into when rendering similar services under similar circumstances, and is the product of arm's length

negotiations. I also believe that the fee structure is reasonable, market-based and designed to compensate Western for its work in a fair and equitable manner. I believe that the Engagement Letter and the terms therein are customary, reasonable, and in the best interests of the Debtors, their estates and their creditors.

### H. Motion of Debtors for Entry of an Order (I) Approving Debtors' Adequate Assurance of Payment to Utilities, (II) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment, and (III) Scheduling a Hearing with Respect to Contested Adequate Assurance of Payment Requests

**49.** Uninterrupted Utility Services (as defined below) are necessary to preserve the value of the Debtors' estates while the Debtors devote their efforts to navigating through their chapter 11 bankruptcy. A disruption of the Utility Services at the Debtors' locations would likely be costly to the Debtors as the Debtors would be forced from the outset of these chapter 11 Cases to focus on finding replacement Utility Providers (if available) and Utility Services, rather than focusing on their reorganization efforts.

**50.** In connection with their business, the Debtors incur utility expenses in the ordinary course of business for, among other things, water and sewer, electricity, gas, telephone, data services, waste removal and other similar services (collectively, the "**Utility Services**") from various utility companies and other providers (the "**Utility Providers**").

**51.** A non-exhaustive list of the Utility Providers providing Utility Services to the Debtors is attached to the motion as Exhibit 1 (the "**Utility List**"). The Debtors have exercised their best efforts to list all of their Utility Providers in Exhibit 1, but it is possible that certain Utility Providers may have been omitted from this list. In the prepetition period, the Debtors paid a monthly average of approximately $36,731.38 to the Utility Providers for Utility

Services. The Debtors already have significant prepetition deposits on hand with several of the Utility Providers.

**52.** The Debtors seek the relief requested in this motion in order to preserve the protections that Utility Providers have under the Bankruptcy Code, while affording the Debtors an opportunity to provide and negotiate adequate protection without facing the threat of imminent termination of Utility Services.

**53.** The Debtors fully intend to pay all post-petition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating their businesses after the Petition Date, and indeed, the Debtors expect that borrowings under their post-petition financing documents will be sufficient to pay for their post-petition Utility Services. In fact, the payment of post-petition Utility Services are a part of, and subject to, the terms and conditions of the Debtors' proposed post-petition financing and the budgets related thereto.

**54.** I believe, and the Debtors submit, that the Utility Deposit Account (as defined in the motion) and the Debtors' ability to make post-petition Utility Services payments in the ordinary course of business pursuant to the terms of their post-petition financing documents, taken together with the facts and circumstances of the Debtors' chapter 11 Cases (together, the "**Proposed Adequate Assurance**"), constitute sufficient adequate assurance to the Utility Providers within the meaning of section 366 of the Bankruptcy Code. I believe that these protections will ensure that all Utility Providers have adequate assurance of payment throughout these Cases, and the Debtors believe that no other or further assurance is necessary.

**55.** I believe that the Proposed Adequate Assurance gives the Utility Providers ample assurance of payment in a well-established manner. I further believe that the circumstances surrounding the Debtors, including the availability of cash pursuant to their post-

petition financing, indicate that the Debtors will meet their post-petition obligations to the Utility Providers as they come due. The Debtors propose to protect the Utility Providers further by establishing the Additional Adequate Assurance Procedures provided in the motion, under which any Utility Provider may request additional adequate assurance in the event that it can demonstrate facts and circumstances that merit additional protection.

**56.** By establishing the Additional Adequate Assurance Procedures, the Debtors seek to implement an orderly process to determine the amount of assurance of payment that is adequate. I believe, and the Debtors submit, that the mechanisms proposed in this motion strike a reasonable, common-sense balance between providing "adequate assurance of payment for utility service that is satisfactory" as set forth in section 366(c)(2) of the Bankruptcy Code, on the one hand, and the Debtors' well-recognized need to conserve cash for use in their business on the other. Without the Additional Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by Utility Providers in an unorganized manner during the critical first stages of their reorganization efforts.

**57.** I also believe that the Additional Adequate Assurance Procedures will ensure that all parties act in good faith by establishing a fair process. I think this will protect the Debtors from an attempt by a Utility Provider to delay a request until the last minute in an effort to force the Debtors to agree to its request or face cessation of essential services.

## I. Motion for Entry of an Order Authorizing the Debtors to Pay Prepetition Sales, Use, Income, Property and Other Taxes and Governmental Charges; (ii) Authorizing the Debtors to Pay Prepetition Fees; and (iii) Directing the Banks and Financial Institutions to Honor and Process the Payment of Such Amounts

**58.** In the ordinary course of their business, the Debtors incur various sales, use, income, property, and other taxes and other similar governmental charges detailed herein

(collectively, the "**Taxes**") as required by the respective federal, state or local taxing or other regulatory, governmental, or taxing authorities (the "**Taxing and Regulatory Authorities**").

**59.** The Taxes include, without limitation, the following:

**(a)** Sales taxes in connection with apparel, gift cards, and other products sold, and use taxes in connection with, among other things, items consumed at the Debtors' facilities, offices, and other facilities[2] (collectively, "**Sales and Use Taxes**");

**(b)** Property taxes on the Debtors' real and personal property ("**Property Taxes**");

**(c)** Occupancy taxes on real property used by the Debtors ("**Occupancy Taxes**"); and

**(d)** Other miscellaneous taxes and governmental charges imposed by Taxing and Regulatory Authorities.

**60.** In addition, in the ordinary course of their business, the Debtors incur various Fees including, without limitation, the following:

**(a)** Business license fees and taxes ("**Business License Fees and Taxes**").

**61.** In some cases, Taxes are paid in arrears once incurred or collected by the Debtors. However, certain jurisdictions require the Debtors to remit estimated sales and use taxes and similar collections on a periodic basis during the month or quarter in which sales are made. The Debtors or the Taxing and Regulatory Authority then "trues up" any deficiency or surplus on the date on which the taxes are actually due.

---

[2] Use taxes are also paid due to the use of cleaning, lawn service, and other real estate maintenance services.

**62.** The Debtors believe that they are substantially current on all of their Taxes and Fees that have become due as of the Petition Date. The only obligations outstanding represent Taxes and Fees that may have accrued, but are not yet legally due or have not yet been billed. In many instances there may be a lag between the time when the Debtors incur an obligation to pay the Taxes and Fees and the date such Taxes and Fees become due and payable under applicable laws or regulations. Therefore, there may be claims against the Debtors for Taxes and Fees that have accrued but remain unpaid as of the Petition Date, and for certain other Taxes and Fees that will come due during the pendency of these Cases.

**63.** By this Motion, the Debtors seek authority, in their discretion, to pay, (i) any prepetition Taxes and Fees that have accrued, but were not yet due and owing or were not paid in full, as of the Petition Date, and (ii) any prepetition Taxes and Fees that arose prior to the Petition Date that become due and owing during the pendency of these Cases in the ordinary course of business. The Debtors estimate that, as of the Petition Date, their accrued and unpaid liabilities for Taxes and Fees in the aggregate do not exceed approximately $143,060.26 calculated as follows:

- Sales and Use Taxes that do not exceed approximately $30,000.00;
- Property Taxes that do not exceed approximately $89,361.14;
- Occupancy Taxes that do not exceed approximately $12,992.00; and
- Business License Taxes and Fees that do not exceed approximately $10,707.12.

**64.** Some Taxes and Fees either have not been paid or have been paid through checks and/or wires that may or may not have been presented or cleared as of the Petition Date. Accordingly, the Debtors seek entry of an order authorizing and directing their banks and financial institutions to honor prepetition checks and wires issued by the Debtors in payment of prepetition Taxes and Fees that, as of the Petition Date, have not cleared or been transferred. In addition, to the extent the Debtors have not yet sought to remit payment with respect to certain

Taxes and Fees, the Debtors seek entry of an order authorizing, but not directing, the issuance of checks or providing for other means of payment as necessary to pay the Taxes and Fees.

**65.** The Debtors believe that payment of the Taxes and Fees is critical to the Debtors' continued, uninterrupted operations. Nonpayment of Taxes may cause Taxing and Regulatory Authorities to take precipitous action, including, but not limited to, filing liens, assessing interest and penalties, preventing the Debtors from conducting business in the applicable jurisdictions, and seeking to lift the automatic stay, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

**66.** Also, the Debtors understand that nonpayment of the Taxes and Fees could result in certain states holding the Debtors' responsible officers personally liable in certain circumstances for unpaid sales and use taxes. To the extent that any such Taxes and Fees remain unpaid by any of the Debtors, their officers could be subject to civil liability or criminal prosecution during the pendency of these Cases. The possibility of any such lawsuit or criminal prosecution would distract the Debtors and their officers in their effort to implement a successful strategy for these Cases.

**67.** The Debtors believe that payment of the Taxes and Fees is necessary to the Debtors' effective reorganization. In particular, the Debtors believe that the payment of the Taxes and Fees is necessary in order to preserve the value of the Debtors' estates, as well as avoiding the cost and expense of adverse actions or litigation being instituted regarding the Taxes and Fees.

## J. Motion of Debtors for Entry of an Order (I) Authorizing Payment of Wages, Compensation and Employee Benefits, and (II) Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations

**68.** As of the Petition Date, the Debtors employed approximately 271 individuals, of which 83 are salaried employees and 188 are hourly employees. 133 of the Employees are employed domestically (the "**Employees**"), and 138 employees are employed in Nova Scotia, Canada by a non-debtor subsidiary. The Debtors are not a party to any collective bargaining agreements.

**69.** By this Motion, pursuant to Code sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors request entry of an order granting the following relief:

**(a)** authorizing, but not directing, the Debtors to: (i) pay, in their sole discretion, all obligations incurred under or related to Wage and Commission Obligations, Payroll Taxes, Reimbursable Expenses and Employee Benefits (each as defined below, and collectively, the "**Employee Obligations**") and all costs incident to the foregoing, and (ii) maintain and continue to honor their practices, programs, and policies with respect to the Employee Obligations as they were in effect as of the Petition Date, and as such may be modified, amended, or supplemented from time-to-time in the ordinary course; and

**(b)** directing applicable banks and other financial institutions (collectively, the "**Banks**") to receive, honor, process and pay any and all checks drawn on the Debtors' payroll and general accounts (collectively, the "**Accounts**") and automatic payroll transfers, to the extent that such checks or transfers relate to any of the foregoing.

**70.** The Debtors have costs and obligations with respect to the Employees relating to the period prior to the Petition Date. Certain of these costs and obligations are

outstanding and due and payable, while others will become due and payable in the ordinary course of the Debtors' business after the Petition Date.

**Wage Obligations**

**71.** Prior to the Petition Date and in the ordinary course of their businesses, the Debtors typically paid obligations relating to wages, salary and compensation for the Employees (the "**Wage Obligations**") on a bi-weekly basis through direct deposits into Employees' accounts or by check. The Debtors' current estimated gross payroll (including tax and other withholding) for the Employees, conducted bi-weekly for most Employees and for others, is approximately $325,200.00.[3]

**72.** Following the Debtors' customary payroll schedule, the next payroll is due to be paid on June 10, 2011 for Employees. Funds for the Wage Obligations are due to be remitted on or about June 8, 2011 to the Debtors' payroll processor.

**Payroll Taxes**

**73.** The Debtors are required by law to withhold from the Wage and Commission Obligations amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "**Withholding Taxes**") and to remit the same to the appropriate taxing authorities (collectively, the "**Taxing Authorities**"). In addition, the Debtors are required to make matching payments from its own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Taxes**").

---

3 This amount fluctuates between pay periods based on employee overtime, the amount of hours worked by part-time employees, and other factors.

74. On a bi-weekly basis for all employees, the Debtors remit to the Taxing Authorities approximately $116,390.00 in Payroll Taxes.[4]

**Payroll Tax Processing Service Obligations**

75. The Debtors employ IPPS to provide payroll tax services to the Debtors. As consideration for providing these payroll tax services to the Debtors, IPPS is paid a monthly fee debited from the bank account. The Debtors pay an average of $3,200.00 per month to IPPS in administrative fees for these services (the "**Payroll Service Fees**"). The Debtors also pay IPPS an annual maintenance fee of approximately $2,400.00 per year. Payment of these fees is crucial for the Debtors' seamless entry into chapter 11. As of the Petition Date, the Debtors believe that they do not owe IPPS any sums in outstanding prepetition amounts for processing payroll.

**Reimbursable Expenses**

76. The Employees incur various expenses (the "**Reimbursable Expenses**") in the discharge of their ordinary duties. Specifically, the Debtors advance or reimburse funds to Employees for a variety of business-related expenses, including without limitation, mileage, car/taxi rental, airfare, parking, meals and lodging. Expenses are advanced or reimbursed on a rolling basis. Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' business, the Employees are advanced or reimbursed in full after submission of appropriate documentation to the Debtors' accounting department.

77. Because certain Employees incur these expenses as part of their official duties and in furtherance of the Debtors' business, the Debtors determine the legitimate and reasonable expenses necessary for the Employees to discharge their duties and such amounts are

---

4 This number fluctuates along with the gross payroll number each payroll cycle.

paid in advance directly to the Employees. Additionally, other Employees are reimbursed in full after submission of appropriate documentation to the Debtors' accounting department.

**78.** Although it is difficult for the Debtors to determine the amount of Reimbursable Expenses outstanding at any particular time, the Debtors estimate that approximately $10,000.00 in Reimbursable Expenses remains outstanding as of the Petition Date.

**79.** The Reimbursable Expenses were all incurred as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed. Accordingly, to avoid financial harm to Employees who incurred Reimbursable Expenses, the Debtors request authority, to be exercised in its sole discretion, to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices and (b) pay all Reimbursable Expenses due and owing (including those that accrued prepetition), or that may become due and owing, to Employees.

**Employee Benefit Plans**

**80.** In the ordinary course of business, the Debtors have established various benefit plans and policies for its Employees, which can be divided into the following categories (collectively, the "**Employee Benefits**"): (1) medical, dental, life and disability insurance (collectively, the "**Health and Welfare Plans**"); and (2) 401(k) plan (the "**401(k) Plan**"). The Debtors deduct specified amounts from the Employees' wages in connection with certain of the Employee Benefits, such as medical insurance and 401(k) Plan contributions.

**81.** Maintaining the Employee Benefits is critical to Employee morale and protecting the integrity of the Debtors' business and the value of its estate.

(a) Health and Welfare Plans

**82.** The Debtors sponsor several Health and Welfare Plans to provide benefits to Employees, including, without limitation, medical, dental, vision, life and disability insurance (the "**Basic Healthcare Package**"). The Debtors offer a Basic Healthcare Package to all of its full-time Employees. The Basic Healthcare Package is administered by Anthem, Delta Dental of Virginia, and Cigna HealthCare.

**83.** Within the Basic Healthcare Package, the Debtors' medical coverage is provided through fully insured medical plans (the "**Medical Plans**"). The Debtors pay approximately $122,420.00 on a monthly basis for coverage under the Medical Plans. As of the Petition Date, the Debtors estimate that they owe Anthem approximately $122,420.00 in accrued and unpaid prepetition amounts on account of the Medical Plans for May, 2011. Payments for June, 2011 and subsequent months will become due each month after the Petition Date.

**84.** Delta Dental of Virginia administers the Debtors' fully insured dental plan ("**Dental Plan**") for most of the Debtors' Employees. The Debtors pay $1,700.00 on a weekly basis for coverage and approximately $525.00 on a monthly basis for administration under the Dental Plan. As of the Petition Date, the Debtors owe $2,225.00 to Delta Dental of Virginia for accrued or unpaid prepetition amounts on account of the Dental Plan for June, 2011; however, subsequent weeks will become due each month after the Petition Date.

**85.** The Debtors maintain short term disability and basic life insurance for certain of its full-time Employees in addition to accidental death and dismemberment coverage ("**Life Insurance Plans**"). The Life and Disability Insurance Plans are administered by Cigna Group Insurance and paid to LINA (Life Insurance Company of North America). The Debtors pay $1,950.00 on a monthly basis for coverage under the Life and Disability Insurance Plans. As of the Petition Date, the Debtors owe Cigna Group Insurance (LINA) approximately $1,950.00

for any accrued or unpaid prepetition amounts on account of the Life and Disability Insurance Plans for May, 2011; however, payments for June, 2011 and subsequent months will become due each month after the Petition Date. In addition, the Debtors also owe New York Disability Insurance (NYDBL) paid to Cigna Life Insurance Company of NY approximately $470.00 on a monthly basis any accrued or unpaid prepetition amounts on disability insurance plans for May, 2011.

(b) Paid Time Off Benefits

**86.** Under the PTO Plans, full-time Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation/well time. Employees are entitled to receive from 10 days to 25 days of paid vacation annually, depending on years of service. Generally, under the Debtors' vacation policy, vacation time is accrued per pay period. As of May 31, 2011, the Debtors estimate that the cash value of the Debtors' Employees' accrued vacation time was approximately $41,930.00. Generally, this amount is not a current cash payment obligation as Employees are only entitled to be paid for accrued and unused vacation time in the event that the Employees were to leave the employment of the Debtors, or if required by applicable state law at the end of the year. As such, most Employees will receive their vacation time as paid time off in the ordinary course of business (and not as a cash payment).

**87.** The Debtors also administer other paid time off programs for holidays, sick time, short-term disability, military duty, jury duty, and bereavement. Unlike vacation time, these other types of leave are not paid upon termination and are only applicable if the leave time is actually used by the Employee.

(c) 401(k) Plan

**88.** The Debtors sponsor a retirement investment plan and withholds from the wages of participating Employees contributions towards the 401(k) Plan. DWS Scudder (the "**401(k) Manager**") administers the 401(k) Plan. The 401(k) Manager does not charge the Debtors any fees for administering the program.

**89.** The Debtors estimate that approximately $15,308.17 in 401(k) Plan contributions remains outstanding as of the Petition Date.

**Workers' Compensation Program**

**90.** Under the laws of the various states in which it operates, the Debtors are required to maintain for its employees workers' compensation coverage for claims arising from or related to their employment with the Debtors (the "**Workers' Compensation Program**"). The Debtors currently maintain their Workers' Compensation Program with Federal Insurance Company (the "**Workers' Compensation Insurer**") as insurer.

**91.** Pursuant to the Workers' Compensation Program, the Debtors pay to the Workers' Compensation Insurer premiums that are calculated based upon the Debtors' payroll and historic loss rates (the "**Workers' Compensation Premiums**"). For the coverage provided by the Workers' Compensation Insurer, the premiums are paid in monthly installments. The Debtors project that, as of the Petition Date, there are no amounts owing for Workers' Compensation Premiums. Under the Debtors' Workers' Compensation Program, as far as the Debtors are aware, there were no open workers' compensation claims ("**Workers' Compensation Claims**") as of the Petition Date.

**92.** The continued best efforts of the Employees is essential to the Debtors' bankruptcy. I believe that the payment, in the Debtors' discretion, of prepetition amounts owing

in connection with the Wage Obligations, Commission Obligations, Performance Payments, Reimbursable Expenses, Payroll Taxes, the Employee Benefits and the Workers' Compensation Premiums is essential to retaining Employees and keeping morale high. Similarly, I believe that continuance of such programs in the ordinary course of business in the Debtors' discretion is vitally important for maintenance of the Debtors' businesses, and will inure to benefit of the Debtors, their estates, and their creditors.

## K. Motion of the Debtors for Entry of an Order (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Use of Existing Business Forms; and (III) Authorizing the Use of Cash Management System

### Continued Use of Bank Accounts

**93.** Prior to the commencement of these Cases, in the ordinary course of their businesses, the Debtors maintain a number of bank accounts, which are utilized to collect funds for their operations and to pay operating and administrative expenses in connection therewith. A listing of the bank accounts (collectively, the "**Bank Accounts**") is attached as Exhibit A to the Motion, and a flow chart of the Bank Accounts is attached as Exhibit B to the Motion. As illustrated in Exhibits A and B to the Motion and as discussed in greater detail below, the Bank Accounts currently consist of bank accounts maintained primarily with Wachovia Bank, a division of Wells Fargo Bank, N.A.

**94.** I believe that all of the Bank Accounts are in financially stable banking institutions. In addition, I believe that all of the Bank Accounts are in banking institutions with FDIC insurance (up to an applicable limit, if any, per Debtor per financial institution).

**95.** I believe that a waiver of the U.S. Trustee's requirement that the prepetition Bank Accounts be closed and that new post-petition bank accounts be opened is necessary. If enforced in these Cases, such a requirement would cause enormous disruption in

the Debtors' businesses and would impair the Debtors' efforts to reorganize and pursue other alternatives to maximize the value of their estates. Indeed, as explained in more detail below, the Bank Accounts comprise an established cash management system that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course.

**Continued Use of Business Forms**

**96.** The Debtors currently have correspondence forms, business forms (including, without limitation, letterhead, purchase orders, and invoices), and checks existing immediately prior to the Petition Date that do not refer to the Debtors' status as debtors in possession.

**97.** I believe that most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the notoriety of these Cases, the press releases issued by the Debtors, and additional other press coverage. Moreover, each of the Debtors' vendors will receive direct notice of the commencement of these Cases.

**98.** I believe that changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors. For these reasons, I believe that the Debtors should be authorized to use existing checks and business forms without being required to place the label "Debtor In Possession" on each.

**Continued Use of Cash Management System**

**99.** The cash management procedures utilized by the Debtors constitute ordinary, usual, and essential business practices and are similar to those used by other major corporate enterprises. The cash management system facilitates cash forecasting and reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating

the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various bank accounts required to effect the collection, disbursement, and movement of cash.

**100.** The operation of the Debtors' business requires that the cash management system continue during the pendency of these Cases. I believe that requiring the Debtors to adopt a new, segmented cash management system at this early and critical stage of these Cases would be expensive, would create unnecessary administrative problems, and would likely be much more disruptive than productive. Any such disruption could have an adverse impact upon the Debtors on their estates.

### L. Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Certain Liens, (III) Modifying the Automatic Stay, and (IV) Scheduling Interim and Final Hearings

**101.** The Debtors have an immediate need to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, fund payroll, preserve and maintain the value of the their assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors and the possibility for a sale of the Debtors' assets as a going concern or otherwise. Following discussions and negotiations among the Debtors and PPAS, the DIP Lenders have agreed to provide financing for the chapter 11 Cases provided that the Debtors pursue an expedited sale of substantially all their assets to Artemiss, LLC (the "**Buyer**"), an acquisition entity formed by the Debtors' prepetition lenders, or to the highest bidder at an auction. The Debtors have determined that a sale of substantially all of their assets pursuant to a section 363 sale process will maximize value for the Debtors' stakeholders.

**102.** In order to provide the Debtors with an opportunity to consummate a sale of their assets, the Debtors require immediate access to the DIP Facility. Without immediate access to the DIP Facility, the Debtors will be unable to pay the post-petition costs and expenses set forth in the Budget and to administer these Cases.

**103.** The principal terms of the DIP Credit Agreement are as follows:[5]

| | |
|---|---|
| **Administrative Agent:** | Patriarch Partners Agency Services, LLC |
| **DIP Lenders:** | Zohar III Limited |
| **Borrower:** | Signature Styles, LLC |
| **Guarantors:** | Signature Styles Gift Cards, LLC and each other Domestic Subsidiary that from time to time become guarantors |
| **DIP Facility:** | The DIP Facility will consist of a senior revolving credit facility with a maximum commitment of $7.0 million. |
| **Maturity Date:** | All (a) DIP Obligations of the Debtors to the DIP Lenders shall be immediately due and payable (subject to the provisions of the Interim Order) and (b) authority to use the proceeds of the DIP Credit Documents shall cease, both on the date that is the earliest to occur of (i) the date on which a sale of all or substantially all of the Debtors' assets is consummated or (ii) August 15, 2011. |
| **Use of Proceeds:** | The DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget solely for general corporate purposes, in each case to the extent expressly permitted under applicable law, the DIP Credit Documents and the DIP Orders. <br><br> Under no circumstances may Loans be used (a) to pay all or part of any Indebtedness of the Debtors arising prior to the Petition Date, except as permitted pursuant to section 6.1(i) of the DIP Credit Agreement or (b) in violation of the DIP Orders. In addition, under no circumstances will the Debtors use, directly or indirectly, the proceeds of the Loans to |

[5] The description of the material terms of the DIP Credit Agreement set forth herein are for summary purposes only and the terms of the DIP Credit Agreement shall control in all circumstances.

compensate services rendered or expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief (i) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Liens granted to the DIP Agent and the DIP Lenders pursuant to the DIP Orders, the DIP Credit Agreement or any of the DIP Credit Documents; (ii) modifying, staying, vacating, or amending the DIP Orders without the consent of the DIP Agent; (iii) granting or imposing, under section 364 of the Bankruptcy Code or otherwise, Liens on any Collateral, whether equal, superior, or subordinate, to the Liens granted to the DIP Agent and the DIP Lenders on such Collateral, except as otherwise expressly permitted by the DIP Credit Agreement, (iv) permitting the use of cash collateral as defined in section 363 of the Bankruptcy Code, except as expressly permitted by the DIP Orders, (v) granting any modification, alteration or impairment in any manner of the Liens, rights or remedies granted to the DIP Agent and the DIP Lenders pursuant to the DIP Orders, the DIP Credit Agreement or any of the DIP Credit Documents (including, without limitation, the DIP Agent's and the DIP Lenders' right to demand payment of all Obligations and to enforce their Liens in the Collateral), whether by plan of reorganization or liquidation, order of confirmation, or any financings of, extensions of credit to, or incurring of Indebtedness by the Debtors, whether pursuant to section 364 of the Bankruptcy Code or otherwise; or (vi) granting a priority for any administrative expense, secured claim or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in sections 105, 326, 327, 328, 330, 331, 503, 506(c), 507, 726 or 1114 of the Bankruptcy Code or otherwise) which are equal or superior to the priority of the DIP Agent and the DIP Lenders in respect of the Obligations.

**Budget:** The Borrower shall not pay any expenditures except in accordance with the Budget, as approved by the DIP Agent.

**Interest Rate:** The Obligations shall bear interest at a rate per annum equal to the LIBOR Rate plus 8%. If the introduction or any change in any law or regulation applicable to any DIP Lender makes it unlawful for any DIP Lender to maintain LIBOR loans, then

the Obligations shall, at Borrower's request, bear interest at a rate per annum equal to the Bare Rate plus 4.5%

Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest payable on demand at a rate equal to 2.0% per annum in excess of the rate otherwise payable.

| | |
|---|---|
| **Security:** | The DIP Facility will be secured by (i) a perfected first priority lien on all property and assets of each Debtor and its estate that, as of the Petition Date, is not subject to any Liens other than avoidable liens; (ii) a perfected lien upon all property and assets of each Debtor that is subject to unavoidable Liens in existence as of the Petition Date other than the Pre-Petition Liens, having a priority that is junior only to such unavoidable Liens; and (iii) a perfected lien on all property of each Debtor that is subject to the Pre-Petition Liens, junior only to the Permitted Prior Liens.<br><br>The DIP Facility will also be secured by a superpriority administrative expense claim having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Debtors, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in Sections 105, 326, 328, 506(c), 507(a) or 1114 of the Bankruptcy Code. |
| **DIP Agent Fee:** | $75,000, payable on the Closing Date and on each anniversary thereof on terms and conditions separately agreed upon by the Agent and the Borrower. |
| **Revolving Commitment Fee:** | Payable monthly in arrears on each Interest Payment Date, a per annum rate equal to 1.50% on each DIP Lender's Pro Rata Share of the daily difference between the Commitments and the aggregate principle amount of outstanding Loans. |
| **Expenses:** | All actual costs and reasonable expenses of the DIP Secured Parties in connection with the DIP Credit Documents, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses will be paid by the Borrower. |

**Termination Date Loans:** On the earlier to occur of (i) the Maturity Date, (ii) the date of the termination of the Commitments pursuant to Section 8.2 of the DIP Credit Agreement, (iii) the conversion of either of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code and (iv) the date following any period of three consecutive Business Days in which the DIP Lenders and the DIP Agent have denied the Borrower's requests to fund Loans to be used to pay Professional Fees and Expenses as a result of an Event of Default, (collectively, the "Termination Date"), the Borrower shall be deemed to have requested (i) a Loan in an aggregate amount equal to the accrued and unpaid Professional Fees and Expenses of Borrower's counsel, less any remaining retainer then held by Borrower's counsel on account of Professional Fees and Expenses incurred in connection with the Chapter 11 Cases, plus $25,000, (ii) if a Creditors' Committee exists, a Loan in an aggregate amount equal to the accrued and unpaid Professional Fees and Expenses of the Creditors' Committee, plus $15,000, and (iii) a Loan in an aggregate amount equal to the accrued and unpaid Professional Fees and Expenses of counsel to the DIP Agent and the DIP Lenders (collectively, the "Termination Date Loans"). The Borrower shall not be required to provide a Borrowing Certificate or otherwise comply with the requirements set forth in Sections 2.2 or Section 3.2 of the DIP Credit Agreement in connection with the Termination Date Loans (other than Sections 3.2(e) and (f) of the DIP Credit Agreement) and the DIP Lenders agree to make such Termination Date Loans notwithstanding Borrower's failure to comply with such sections so long as the conditions precedent in Sections 3.2(e) and (f) of the DIP Credit Agreement have been satisfied. The proceeds of the Termination Date Loans (other than proceeds of the Termination Date Loans described in clause (iii) immediately above) shall be deposited directly into the Professional Fee Account and the proceeds of the Termination Date Loans described in clause (iii) immediately above shall be deposited directly into an account designated by counsel to the DIP Agent and the DIP Lenders. Professional Fees and Expenses of Debtors' counsel and the Creditors' Committee that are allowed by order of the Court but are unpaid, or are incurred after the Termination Date in an amount up to $25,000 for Debtors' counsel, and $15,000 for the Creditors' Committee, shall be paid to Debtors' counsel or the Creditors' Committee's professionals, as applicable, from the Professional Fee Account. Any proceeds of the Termination Date Loans in

excess of the Professional Fees and Expenses that are paid pursuant to the preceding sentence shall be returned the DIP Lenders. In no event shall the aggregate amount of Loans used to pay Professional Fees and Expenses exceed $1,400,000.

**Events of Default:**

The usual and customary events of default for a credit facility of this type, but also including several transaction-specific events of default, such as: (i) the failure of the Debtors to file with the Court, on the Petition Date, a motion seeking entry of an order approving bidding procedures for the 363 Asset Sale, in form and substance acceptable to the DIP Agent (the "Bidding Procedures Order"); (ii) the failure of the Debtors to file with the Court, on the Petition Date, a motion seeking entry of an order (the "Sale Approval Order") approving the Stalking Horse Agreement, in form and substance acceptable to the DIP Agent; (iii) the failure of the Court to (a) enter the Bidding Procedures Order on or before June 30, 2011 and (b) enter the Sale Approval Order on or before August 4, 2011; (iv) the failure of the Court to enter a Final DIP on or before June 30, 2011; and (v) the entry of an order by the Court approving the sale of any material assets of the Debtors to a purchaser other than the Buyer.

**Remedies on Default:**

Subject to the terms of the DIP Orders, upon the occurrence, and during the continuation, of an Event of Default, the DIP Agent may, and at the request of the Required Lenders shall, by notice to the Borrower from time to time do any or all of the following: (i) declare the unpaid principal amount of the Loans and interest accrued thereon and all other Obligations to be immediately due and payable, which shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower or (ii) declare the Commitments terminated, whereupon the Commitments will terminate and any fee hereunder shall be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby waived, and an action therefor shall immediately accrue. The DIP Agent shall, at the request of or with the consent of the Required Lenders, (i) exercise all rights and remedies provided in the Credit Documents, (ii) exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of the Borrower, (iii) bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any

| | |
|---|---|
| | Credit Document and may exercise any power granted under or to recover judgment under any Credit Document, (iv) enforce any and all Liens and security interests created pursuant to the Credit Documents, and (v) exercise any other right or remedy permitted by applicable Regulations. The DIP Agent and the DIP Lenders shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document. |
| **Covenants:** | Usual and customary affirmative and negative covenants for asset based facilities of this type. |
| **Representations and Warranties:** | Usual and customary for a facility of this type. |

**104.** The Debtors were unable to obtain post-petition financing on an unsecured basis or on a junior priority basis to the Pre-Petition Lenders. The Debtors negotiated the DIP Credit Agreement at arm's length and have determined, in the exercise of their business judgment, that it is the best proposal under the circumstances.

**105.** As described above, immediate access to the DIP Facility is critical because of the substantial cash needs to operate the Debtors' business. The financing under the DIP Facility will allow the Debtors, *inter alia*, to (a) fund the continued operation of, and minimize disruption to, their business and operations, (b) avoid immediate and irreparable harm to their businesses, their creditors, their employees and their assets and (c) permit the Debtors to sell their business as a going concern. The financing provided for in the DIP Credit Agreement is critical to avoid liquidation, preserve numerous jobs and enable the business to continue as a going concern.

**106.** The Debtors believe that the terms and conditions of the DIP Credit Agreement, including the fee structure set forth in the DIP Credit Agreement, are fair and reasonable under the circumstances. Accordingly, the Debtors request that the DIP Lenders be afforded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Credit

Agreement. Based upon the foregoing, the Debtors respectfully request that the Court approve the DIP Facility in accordance with the terms set forth in the Interim Order and the DIP Credit Agreement.

## M. Motion of Debtors for Entry of an Order Authorizing the Debtors to Reject Certain Contracts *Nunc Pro Tunc* as of the Petition Date

**107.** The Debtors are requesting entry of an order authorizing and approving the rejection of certain executory contracts (collectively, the "**Rejected Contracts**") *nunc pro tunc* to the Petition Date. The Debtors have determined that the Rejected Contracts are no longer necessary to their on-going business operations and have therefore decided to eliminate the unnecessary expenses related to maintaining the contracts. None of these contracts will be utilized by the Debtors after the Petition Date and, therefore, in order to alleviate unnecessary administrative costs for the estates, I believe that rejection of these contracts is appropriate.

**108.** I believe that the rejection of the Rejected Contracts is justified under the business judgment standard. Further, as the Debtors are proposing to sell substantially all of their assets during the pendency of these Cases, the rejection of these contracts will make the acquisition of the Debtors' assets, unencumbered by the Rejected Contracts, more attractive to bidders and thereby maximize value for the Debtors' estates.

## N. Motion of the Debtors for Entry of an Order Pursuant to Bankruptcy Rules 2002(l), 2002(m) and 9007 to Establish Notice Procedures

**109.** The Debtors seek to establish notice procedures that would limit notice to certain parties and entities in these Cases. In the ordinary course of their retail business, the Debtors engaged in certain customer programs such as gift cards, rewards programs, and merchandise credit certificates, to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace (collectively, the "**Customer**

**Programs**"). Pursuant to such Customer Programs, the Debtors have over approximately 250,000 creditors and parties in interest (collectively, "**Program Creditors**") in these Cases.

**110.** Due to the significant number of these Program Creditors, and to reduce the administrative costs and burden on the Debtors and their estates, I request that this Court enter an order (i) establishing notice procedures which would limit notice to the Program Creditors unless otherwise ordered by the Court; and (ii) authorizing service of pleadings as set forth herein.

**111.** Notice by mail of all pleadings and other papers filed in these Cases to each of the Program Creditors would be extremely burdensome and tremendously costly to the estates. Therefore, the Debtors propose the procedures set forth below regarding notice to the Program Creditors and service of documents on the Program Creditors in these Cases (the "**Notice Procedures**").

**112.** Given that the Debtors conducted a majority of their business via internet sales, the Debtors propose that any notice filed with the Court in these Cases that would entitle Program Creditors to receive notice under the Bankruptcy Code and the Bankruptcy Rules, including, but not limited to, the notice of commencement of these Cases and any notice of sale be served in the following manner:

**(a)** To the extent the Debtors have a valid email address for a Program Creditor, via email to the email addresses available in the Debtors' business records, which email shall contain a copy of the relevant pleading or a link to the case specific website maintained by the Debtors' claims agent (http://dm.epiq11.com/SignatureStyles) (**"Email Notice"**);

**(b)** To the extent no email address is available, via regular United States Mail on a postcard size mailing (4x6 inches) that directs the recipient Program Creditor to

the case specific website maintained by the Debtors' claims agent (http://dm.epiq11.com/SignatureStyles) ("**Postcard Notice**"),[6] which notice shall also include a toll free number for any creditors that may not have internet access; or

**(c)** To the extent the Program Creditor is unknown to the Debtors, by posting notice on the case specific website maintained by the Debtors' claims agent (http://dm.epiq11.com/SignatureStyles) ("**Publication Notice**" and together with Email Notice and Postcard Notice, the "**Notices**").

**113.** The Notices shall contain, at a minimum, the following disclaimers: (i) that the party currently holding the gift card is the one with the actual claim and (ii) if the recipient of the notice is not the party holding the gift card that the recipient should notify the claims agent via its case specific website as to the name and address of the person currently holding the gift card that was purchased by the notice recipient. As set forth above, the Debtors have filed an application to employ Epiq. The Claims Agent maintains a web site at http://dm.epiq11.com/SignatureStyles, where electronic copies of certain pleadings and other documents will be posted within 1 business days of filing and may be viewed free of charge. I believe under the circumstances of these Cases, the Notice Procedures are the most reasonable means to accommodate our notice requirements to all creditors and parties in interest.

[6] By way of example, it is the Debtors' understanding that serving the Notice of Commencement on all Program Creditors via U.S. Mail will cost approximately $140,000. However, to the extent the noticing procedures set forth herein are approved by this Court, and the Notice of Commencement is served via 4x6 postcard, the Debtors could reduce the cost of such service by half to approximately $70,000. This does not take into account any reduction that would also be realized by the proposed e-mail notice. The Debtors are still in the process of reviewing their books and records to determine how many valid e-mail addresses they have on file. Any service via e-mail would further reduce the cost of such service.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 6, 2011

By: */s/ Robert Angart*
Name: Robert Angart
Title: Chief Restructuring Officer