## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Signature Styles, LLC,[1] | ) | Case No. 11-_____ (___) |
|    a Delaware limited liability company, | ) | |
| | ) | Joint Administration Pending |
|            Debtors. | ) | |

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 363 AND 365, RULES 2002, 6004, 6006, 9007 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND LOCAL RULE 6004-1, AUTHORIZING (I) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND (II) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Signature Styles, LLC ("**SSL**") and Signature Styles Gift Cards, LLC ("**SS Gift Cards**" and together with SSL, the "**Debtors**"), as debtors and debtors in possession in the above-captioned cases, hereby move the Court, pursuant to sections 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an order (the "**Sale Order**"):

(a)    authorizing the sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**") to the Buyer (as defined below) or such other party that is the successful bidder at

---

[1] The Debtors in these chapter 11 cases, and the last four digits of their respective tax identification numbers, are: Signature Styles, LLC (4502) and Signature Style Gift Cards, LLC (8699). The location of the Debtors' corporate headquarters is: 711 Third Avenue, 4th Floor, New York, New York 10017.

the Auction (as defined below),[2] free and clear of all liens, claims and encumbrances, except for certain assumed liabilities;

(b)     authorizing the assumption and assignment of executory contracts and unexpired leases in connection with the Sale; and

(c)     granting certain related relief as described herein

## JURISDICTION

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 363 and 365 of the Bankruptcy Code and Local Rule 6004-1.

## BACKGROUND

3.     On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing the above-captioned chapter 11 cases (the "**Cases**"). The factual background regarding the Debtors, including their respective business operations, their capital and debt structure, and the events leading to the filing of these Cases, is set forth in detail in the Declaration of Robert Angart in Support of

---

[2]     Concurrently with this Motion, the Debtors are filing Debtors' Motion for an Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases and (IV) Scheduling an Auction and Sale Hearing (the "**Bidding Procedures Motion**").

Chapter 11 Petitions and First Day Pleadings (the **"Angart Declaration"**), filed concurrently herewith and fully incorporated herein by reference.

4. The Debtors are continuing in possession of their respective properties and are operating and maintaining their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No trustee or examiner has been appointed in these Cases, and no creditors' committee has yet been appointed.

## *Events Leading to the Debtors' Bankruptcy Filing and the Proposed Sale*

6. As described in the Angart Declaration, SSL acquired the assets of Spiegel Brands, Inc. and certain of its affiliates (collectively, the **"Spiegel Brands"**) at a foreclosure sale conducted in June 2009. The foreclosing lenders, through their investment banker, had conducted a robust marketing process for Spiegel Brands' assets, but SSL was the only party that ultimately submitted a bid for the assets. SSL acquired the assets of Spiegel Brands for a purchase price of $21.7 million.

7. Pursuant to a Credit Agreement (as subsequently amended, the **"Prepetition Credit Agreement"**) dated as of June 12, 2009 by and among SSL, as borrower, SS Gift Cards, as guarantor, Zohar II 2005-1 Limited and Zohar III, Limited, as lenders (collectively, the **"Prepetition Lenders"**), and Patriarch Partners Agency Services, LLC (**"PPAS"**), as administrative agent, the Prepetition Lenders financed SSL's acquisition of Spiegel Brands by providing SSL with a term loan in the amount of $21.7 million and a revolver (the **"Revolver"**) in the original amount of $5 million.

8. After the acquisition, the Debtors' businesses encountered immediate financial problems as a result of the deteriorating economy and the general decline in retail sales. The Debtors' decreasing revenues and ensuing losses drained their cash resources and limited

3

their ability to ship catalogs or purchase adequate inventory. These handicaps spurred additional sales declines, which further aggravated the Debtors' cash constraints. As of the Petition Date, the Debtors had approximately $50,000 in cash on their books.

9. In response to the Debtors' problems, the Prepetition Lenders, over the last two years, entered into a series of amendments to the Prepetition Credit Agreement that cumulatively increased the available commitment under the Revolver from the original $5 million to $17 million as of the Petition Date. As of April 30, 2011, the Debtors had nearly exhausted the Revolver, with an outstanding balance of approximately $16.5 million.[3] The Debtors missed several required monthly interest payments under the Loans and, as a result, events of default exist under the Pre-Petition Credit Agreement. Because the Debtors had not cured these events of default prior to the Petition Date, the Pre-Petition Lenders have no further obligation to make advances under the Pre-Petition Credit Agreement, and, in fact, were unwilling to provide any further prepetition funding to the Debtors.

10. In addition to increasing borrowings under the Revolver, the Debtors also committed to aggressively reduce operating costs. As part of that commitment, the Debtors reduced their workforce from 216 employees to 133. Although recently implemented, these cost-cutting strategies will not be sufficient to restore the Debtors to profitability. The Debtors continue to carry significant legacy liabilities, including leases for warehouse and office space considerably larger than the Debtors actually need. The Debtors' reduced level of operations can simply no longer support their liabilities.

---

[3]      As of the Petition Date, the amount outstanding under the Revolver, including accrued interest, was approximately $14.59 million.

11.     For the year 2010, the Debtors had net sales of $119.9 million, losses from operations of $25.6 million and net income of negative $31.1 million. For the three months ending March, 2011, net sales were $10.8 million, operating losses were $3.4 million and net income was negative $5.0 million. For the year 2010 and three months ended March 2011, the Debtors were unable to generate sufficient EBITDA to cover their interest expense.

12.     The Debtors are overleveraged and unable to sustain business operations. Accordingly, the Debtors have determined that a sale of substantially all of their assets is in the best interests of all stakeholders because it will maximize the value of the Debtors' assets.

13.     Prior to the Petition Date, the Debtors hired Mr. Robert Angart as Chief Restructuring Officer and authorized the filing of these bankruptcy cases and the proposed sale process, including the execution of a stalking-horse agreement with Artemiss, LLC ("**Artemiss**"), an acquisition vehicle formed by the Prepetition Lenders. In addition, the Debtors entered into a debtor in possession financing agreement with one of their Prepetition Lenders that will provide the Debtors with sufficient financing to conduct a 60 day marketing and sale process for the Assets.

14.     To assist in the marketing and sale of the Assets, the Debtors retained Western Reserve Partners LLC ("**Western Reserve**"), a Cleveland-based investment banking firm with substantial experience in sell-side representations of middle market companies. Since their retention prior to the Petition Date, Western Reserve has contacted approximately 15 potential bidders and identified more than 100 candidates that might potentially have an interest in acquiring the Assets. During the course of these Cases, Western Reserve will supervise the sale process, market the Assets, contact potential bidders, distribute an offering memorandum, establish an electronic data room for prospective bidders to conduct due diligence and generally

be available to respond to information requests from potential buyers.[4] The Debtors believe this coordinated and comprehensive sale process will produce the highest available bid and maximize value for the Debtors' stakeholders.

## *The Bidding Procedures Motion and Proposed Order*

15.     The Debtors have negotiated the terms of an asset purchase agreement (the "**Stalking Horse Agreement**") with Artemiss (the "**Buyer**"), an acquisition entity formed by the Prepetition Lenders, pursuant to which the Buyer has agreed to act as a stalking horse bidder for the sale of substantially all of the Debtors' assets. A copy of the Stalking Horse Agreement is attached hereto as Exhibit A. The Bidding Procedures Motion seeks approval of bidding procedures for an auction to sell substantially all of the Debtors' assets to the Buyer on the terms and conditions of the Stalking Horse Agreement, or to such other bidder or bidders that submit a higher or better bid for the assets at an auction to be held by the Debtors. Specifically, the Bidding Procedures Motion seeks, among other things:

> a.     approval of proposed bidding procedures, as well as proposed bid protections, for the Sale;
>
> b.     scheduling of an auction (the "**Auction**") and sale hearing (the "**Sale Hearing**") in connection with the Sale;
>
> c.     approval of the form and manner of notice of the Sale and assumption and assignment of executory contracts and unexpired leases.

16.     The Stalking Horse Agreement provides for the sale of substantially all of the Debtors' assets free and clear of liens, claims and encumbrances, as well as the assumption and assignment of certain executory contracts and unexpired leases in connection therewith

---

[4]     Concurrently herewith, the Debtors have filed an application, seeking to retain Western Reserve as investment banker in these Cases.

(collectively, the "**Sale Transaction**"). The Debtors are conducting an auction sale process to provide an opportunity for other parties to purchase the Debtors' assets on terms more favorable than those offered by the Buyer.

17.     As outlined above, with the assistance of Western Reserve, their investment banker, the Debtors anticipate engaging in a comprehensive marketing process. Western Reserve has already contacted approximately 15 potential bidders and identified more than 100 candidates that might potentially have an interest in acquiring the Assets. In addition, Western Reserve has been working with the Debtors to prepare an offering memorandum and establish a virtual data room. Western Reserve will supervise the sale process during the course of the Cases and be available to respond to any information requests from potential buyers.

## RELIEF REQUESTED

18.     By this Motion, the Debtors respectfully request the entry of the Sale Order:

(a)     approving the sale of substantially all of the Debtors' assets to the Buyer pursuant to the Stalking Horse Agreement or to such other party that is the successful bidder at the Auction, free and clear of all liens, claims and encumbrances except for certain assumed liabilities;

(b)     approving the assumption and assignment of executory contracts and unexpired leases in connection with the Sale;

(c)     finding that the Buyer or such other party that is the successful bidder at the Auction is a "good faith purchaser," as that term is defined in section 363(m) of the Bankruptcy Code, and has not violated section 363(n) of the Bankruptcy Code;

(d)     waiving the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d); and

(e)     granting certain related relief.

## THE STALKING HORSE AGREEMENT

19.     Local Rule 6004-1(b)(iv) provides, among other things, that a sale motion "must highlight material terms" of the proposed Stalking Horse Agreement and Sale Order. The Debtors submit that the description of the material terms of the Stalking Horse Agreement and Sale Order set forth herein complies with Local Rule 6004-1(b)(iv). By way of summary, the primary terms of the Stalking Horse Agreement are set forth below:[5]

20.     Pursuant to the Stalking Horse Agreement, the Buyer will acquire substantially all of the Debtors' assets (the "**Purchased Assets**"). Assets that will not be purchased (the "**Excluded Assets**") include: (a) certain books and records; (b) avoidance actions of the Debtors' estates under chapter 5 of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code other than avoidance actions relating to (i) the Pre-Petition Obligations, (ii) the Pre-Petition Lenders or the Pre-Petition Agent (as such term is defined in the Stalking Horse Agreement), (iii) the Debtors' customers and (iv) the Debtors' suppliers listed on Schedule 1.1 of the Stalking Horse Agreement and effectively consisting of the suppliers whose contracts will be assumed and assigned as part of the Sale; (c) all leases other than the Assumed Leases (as defined below), (d) equity interests in the Debtors or any of their affiliates, and (e) all contracts other than the Assumed Contracts (as defined below) or any postpetition contracts.

---

[5]     Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Stalking Horse Agreement or the Sale Order, as the case may be. The description of the material terms of the Stalking Horse Agreement set forth herein is for summary purposes only and the terms of the Stalking Horse Agreement shall control in all circumstances.

21.     Local Rule 6004-1(b)(iv)(K) requires that a debtor disclose if it intends to sell any avoidance actions as part of any sale transaction. The Assets include those avoidance actions relating to (a) the Pre-Petition Obligations, (b) the Prepetition Lenders, (c) the Pre-Petition Agent, (d) the Debtors' customers, and (e) the Debtors' suppliers listed on Schedule 1.1 of the Stalking Horse Agreement, effectively consisting of the suppliers whose contracts will be assumed and assigned as part of the Sale. The Buyer required these provisions of the Stalking Horse Agreement to, among other things, enable the Buyer to maintain supplier and customer relationships after the consummation of the Sale. Maintaining these relationships will enhance the Debtors' business and help ensure that the Buyer receives necessary goods and services in the future on reasonable payment terms. Accordingly, the Debtors submit that this aspect of the Stalking Horse Agreement is reasonable and necessary to consummate the Sale.

22.     The Stalking Horse Agreement provides for the assumption by the Debtors and the assignment to the Buyer of various executory contracts and unexpired leases. An initial listing of executory contracts (the "**Assumed Contracts**") and unexpired leases (the "**Assumed Leases**") that may be assumed and assigned to the Buyer is included on Schedule 2.1(a) to the Stalking Horse Agreement. The Buyer will have until the bid deadline to elect in its sole discretion to add or delete contracts or leases to or from Schedule 2.1(a). After the bid deadline, the Buyer may elect to delete contracts or leases from Schedule 2.1(a) if the actual costs of curing defaults under any Assumed Contract or Assumed Lease is higher than the cost estimated by the Debtors. Pursuant to Section 3.4 of the Stalking Horse Agreement, the Buyer will be responsible for all costs of curing defaults under any Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code.

23.     As set forth in Section 2.4 of the Stalking Horse Agreement, the aggregate consideration the Debtors will receive under the Stalking Horse Agreement will be the assumption of the Assumed Liabilities (as defined below).    In addition, the Buyer or its subsidiary will provide merchandise credits under its loyalty award program for prior retail customers of SSL in amounts, dollar-for-dollar, equal to (a) the amounts payable for returns of merchandise purchased prior to the Petition Date and that are to be settled in cash by SSL under current SSL policy and that remain outstanding on the Petition Date (the "**Merchandise Return Credits**");[6] and (b) up to $10 million of the amount of any remaining balance of gift cards or gift certificates that were purchased by third parties prior to the Petition Date or that were issued or are to be issued for returns of merchandise purchased prior to the Petition Date in accordance with SSL policy, in each case to the extent outstanding as of the Closing Date ("**Gift Card Credits**" and, together with the Merchandise Return Credits, the "**Customer Loyalty Credits**").[7]    The Customer Loyalty Credits can be applied solely to the purchase price of merchandise offered for retail sale by Buyer following the Closing; provided, however, (i) the Merchandise Return Credits will expire without further liability to Buyer on the first anniversary of the Closing Date and (ii) the Gift Card Credits will expire without further liability to Buyer on the date that is four months following the Closing Date.   For the avoidance of doubt, (x) the Customer Loyalty Credits shall be independent of, and not limit, any SSL retail customer's

---

[6]     The Debtors estimate that the aggregate amount payable for returns of merchandise purchased prior to the Petition Date that are to be settled in cash by SSL under current SSL policy and that remain outstanding on the Petition Date is approximately $8.5 million.

[7]     The Debtors estimate that the aggregate balance of gift cards or gift certificates outstanding as of the Petition Date that were (a) purchased by third parties prior to the Petition Date or (b) issued for returns of merchandise purchased prior to the Petition Date in accordance with SSL policy is approximately $18.1 million.

claims against either Seller's estate, and (y) the Gift Card Credits shall not apply to any gift card or gift certificate (including any gift card or gift certificate issued in connection with any Debtors' promotion or reward program) other than those of the type described in subpart (b) of Section 2.4 of the Stalking Horse Agreement.

24.     Pursuant to the Stalking Horse Agreement, the Buyer will assume only the following liabilities (the "**Assumed Liabilities**"):     (a) the Pre-Petition Term and Revolver Obligations and the DIP Facility Obligations in an aggregate amount equal to $30,000,000, such amount to be allocated between the outstanding Pre-Petition Term and Revolver Obligations and the outstanding DIP Facility Obligations, in the sole discretion of Buyer; (b) all liabilities accruing or due to be performed from and after the closing under the Assumed Contracts, Assumed Leases and the Post-Petition Contracts; (d) all liabilities for employee compensation and certain employee benefits; (e) the liabilities and obligations of Sellers to retail customers for (i) merchandise returned to Sellers that was purchased on or after the Petition Date to the extent not satisfied as of the Closing Date, (ii) outstanding merchandise ordered on or after the Petition Date to the extent not satisfied as of the Closing Date and (iii) gift cards or gift certificates purchased on or after the Petition Date to the extent not satisfied as of the Closing Date; and (f) all liabilities under or in respect of any employee benefit or welfare plan. If the Buyer is not the prevailing party at the Auction, the successful bidder at the Auction will not be permitted to assume any portion of the Pre-Petition Term and Revolver Obligations or the DIP Facility Obligations, but instead will be required to pay in full those obligations.

25.     Local Rule 6004(b)(iv)(N) requires the disclosure of any provision that allows credit bidding. Although not a credit bid, pursuant to Section 2.4 of the Stalking Horse Agreement, the aggregate consideration for the Purchased Assets consists of the assumption of,

among other things, the Pre-Petition Term and Revolver Obligations and the DIP Facility Obligations in an aggregate amount equal to $30,000,000. Additionally, Section 7.1(d) of the Stalking Horse Agreement requires the Prepetition Lenders and the DIP Lenders, as a condition to the Debtors' obligation to close, to provide the Debtors with a release in the aggregate amount of $30,000,000 with respect to, respectively, the portions of the Pre-Petition Term and Revolver Obligations and the DIP Obligations that are being assumed by the Buyer.

26. The Stalking Horse Agreement contains certain provisions governing the termination rights of the parties, which are set forth in Section 8.1 of the Stalking Horse Agreement. In general, (a) the parties can terminate the Stalking Horse Agreement by mutual consent, (b) the Debtors can terminate if the Buyer is in material breach of the Stalking Horse Agreement and such breach continues for a certain period following written notice from the Debtors, or (c) the Buyer may terminate the Stalking Horse Agreement under the following circumstances:

> (i) if the Debtors are in material breach of the Stalking Horse Agreement and such breach continues for a certain period following written notice from the Buyer;
>
> (ii) if the Bidding Procedures Order has not been entered by the Court on or before June 30, 2011;
>
> (iii) if the DIP Order approving the DIP Facility on a final basis has not been entered on or before July 7, 2011;
>
> (iv) if the Sale Order has not been entered by the Court on or before August 4, 2011;
>
> (v) if any provision of the Bidding Procedures Order, the DIP Order or the Sale Order has been stayed, revoked, amended or otherwise changed without the prior written consent of Buyer;
>
> (vi) if an order has been entered by the Court approving the sale of all or any portion of the Purchased Assets to a third party;

(vii) if a default or event of default occurs and is continuing under the DIP Facility; or

(viii) if the closing of the Sale has not occurred on or before August 5, 2011.

27. The Buyer has not been required to post a deposit in connection with the Stalking Horse Agreement.

28. Local Rule 6004-1(b)(iv)(B) requires the disclosure of, among other things, the material terms of agreements between the management of a debtor and a proposed purchaser. The Debtors are not aware that there have been any such arrangements implemented as of the date of the filing of this Motion. Nevertheless, to the extent that such arrangements are implemented in the future, the Debtors will file a disclosure with the Court with the material terms of such arrangements.

29. The Stalking Horse Agreement contains certain conditions that must be satisfied prior to the closing of the Sale Transaction. Among other things, the Buyer's obligation to consummate the Sale is subject to the satisfaction at or prior to the closing date of each of the following conditions: (a) all representations and warranties of the Debtors are true and correct as of the date of the Stalking Horse Agreement and as of the Closing Date; (b) each Debtor shall have performed the covenants required by the Stalking Horse Agreement; (c) the Sale Order, the DIP Order and the Bidding Procedures Order shall each have been entered by the Court, shall not be subject to any stay of effectiveness and each shall have become a Final Order; (d) the amount of the merchandise returns underlying the Merchandise Return Credits does not exceed $9,000,000; and (e) each Debtor has executed and delivered certain agreements, instruments and documents to the Buyer.

30. Finally, Local Rule 6004-1(b)(iv)(J) requires that the Debtors indicate how they will retain access to their books and records to administer their estates after the closing date.

Pursuant to Section 6.11 of the Stalking Horse Agreement, each of the Debtors and the Buyer generally is required to preserve all books and records relating to the business of the Debtors for a period of three years after the closing and to make such records available to the other party for such period of time. In addition, the Excluded Assets include the Debtors' "company seal, minute books, charter documents, stock or equity record books and such other books and records pertaining to the organization, existence or capitalization of such [Debtor] as an entity."

## THE PROPOSED SALE ORDER

31. The proposed Sale Order attached hereto as Exhibit B also contains certain provisions that require disclosure under Local Rule 6004-1. Local Rule 6004-1(b)(iv)(C) requires disclosure of any releases provided pursuant to the Sale Transaction. Paragraph 21 of the Sale Order provides the Buyer with releases relating to the Purchased Assets, including releases of any liabilities not defined as Assumed Liabilities under the Stalking Horse Agreement. These releases are necessary to assure the Buyer that it is assuming no liabilities other than the contractually agreed upon Assumed Liabilities. The Debtors also submit that, as of the date of the filing of this Motion, it is aware of no claim against the Buyer that would be released by such provisions.

32. Local Rule 6004-1(b)(iv)(L) also provides that a sale motion highlight "anti-successor liability" provisions in a sale order. Paragraphs N, O, 6, 7 and 21 provide protection to the Buyer against successor liability claims. The Debtors will have material unpaid pre-petition unsecured claims after the closing of the Sale. Neither the Buyer nor any other party would likely be willing to purchase the Debtors' assets if it were at risk of liability for those claims under principles of successor liability. In addition, the Debtors are providing direct notice of the sale to all known creditors of the Debtors' estates and are also publishing notice of the sale in the national edition of *The Wall Street Journal*. The Debtors submit that notice of the

proposed "no successor liability" findings in the Sale Order is sufficient to bind all potentially affected parties.

33.     Finally, the Sale Order provides for a waiver of the 14-day stay period for the effectiveness of the order under Bankruptcy Rule 6004(h), as well as the 14-day stay period provided for in Bankruptcy Rule 6006(d). For the reasons set forth below, the Debtors submit that cause exists for such waivers.

34.     The Debtors and their advisors believe that the Stalking Horse Agreement, or such other agreement that the Debtors enter into with the prevailing bidder at the Auction, represents the best possible outcome for these cases. As noted above and in the Angart Declaration, the Debtors' cash constraints mandate a prompt sale of the Debtors' assets. Additionally, the proposed Sale ensures that the Debtors will be able to capture their value as a going concern. As a result, the sale at this time will not only maximize the value of the estates, but will also likely ensure the preservation of more than 100 jobs. Preservation of jobs, when possible, is an important element of any successful chapter 11 case. *See The LTV Corp. v. Back (In re Chateaugay Corp)*, 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996) (noting that "[p]ublic policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and the concomitant preservation of jobs . . . .").

## BASIS FOR RELIEF

### I.     Approval of the Sale Transaction Under Section 363

35.     Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A debtor must articulate a valid business justification to obtain court approval to proceed with asset sales outside of the ordinary course of business under section 363(b) of the Bankruptcy Code. *See, e.g., Myers v. Martin (In re Martin)*,

91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same). Generally, courts require a debtor to satisfy the following four requirements in connection with a sale under section 363 of the Bankruptcy Code: "(1) a sound business purpose exists; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith." *In re Decora Indus., Inc.*, 2002 WL 32332749, at * 2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

36. When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

37. In the instant case, a strong business justification exists for the Sale. A sale prior to confirmation is necessary to avoid a liquidation, and the proposed Sale will maximize recoveries for the Debtors' estates. Additionally, the Buyer or such other party that is the successful bidder at the Auction likely will continue to operate the Debtors' businesses, thus

likely preserving more than 100 jobs. Furthermore, notice of the Sale has been reasonable and adequate. The Debtors are providing direct notice of the sale to all known creditors of the Debtors' estates and are also publishing notice of the sale in the national edition of *The Wall Street Journal*. Further, the Sale has been proposed in good faith. Finally, because the Sale is subject to bid procedures and an auction, the price ultimately received as a result of the successful bid should, based on the process alone, be deemed fair and reasonable.

## II.     The Buyer is a Good Faith Purchaser

38.     The Debtors request that the Buyer or such other party that is the successful bidder at the Auction receive the protections set forth in section 363(m) of the Bankruptcy Code. Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the United States Court of Appeals for the Third Circuit previously addressed the meaning of the term:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Abbotts Dairies*, 788 F.2d at 147.

39.     The Debtors and the Buyer have entered into the Stalking Horse Agreement without collusion, in good faith and from arm's-length bargaining positions. In this regard, although the Buyer is an indirect affiliate of the Debtors, each of the Buyer and the

Debtors has engaged separate counsel to represent it in its negotiation of the Stalking Horse Agreement. To the Debtors' knowledge, no party has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be set aside under section 363(n) of the Bankruptcy Code. Similarly, the Debtors submit that any sale agreement it enters into with such other party that is the successful bidder at the Auction will also have been negotiated at arms-length and in good faith. Accordingly, the Debtors seek a finding that the Buyer or such other party that is the successful bidder at the Auction is a good faith purchaser under section 363(m) of the Bankruptcy Code and has not violated section 363(n) of the Bankruptcy Code.

## III.    Approval of the Sale Free and Clear of Liens, Claims and Encumbrances

40.     The Debtors request approval to sell their assets free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, except for the Assumed Liabilities. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Collins*, 180 B.R. 447, 499-50 (Bankr. E.D. Va. 1995)

("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale."); *In re P.K.R. Convalescent*

*Ctrs., Inc.*, 189 B.R. 90, 93-94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens . . . Section 363(f) addresses sales free and clear of any interest . . . ."). In addition, a court may authorize the sale of a debtor's assets free and clear of any liens, claims or encumbrances under section 105 of the Bankruptcy Code. *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

41.     Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any claims against the debtor. *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of §363(f)); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same). Accordingly, the Debtors submit that the sale of their assets free and clear of liens, claims and encumbrances satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code. The Debtors also believe that the service of the sale notice in accordance with the terms set forth in the Bidding Procedures Motion will afford creditors sufficient notice of the Sale and therefore provides additional justification for approval of the sale free and clear of all liens, claims and encumbrances.

## IV.     Approval of the Assumption and Assignment of Contracts and Unexpired Leases

42.     The Debtors seek authority to assume and assign executory contracts and unexpired leases in connection with the Sale. Section 365 of the Bankruptcy Code generally allows a debtor to assume or reject almost any executory contract and unexpired lease. 11 U.S.C. § 365(a). The ability to assume and reject executory contracts and unexpired leases allows a debtor to maximize the value of its estate by assuming executory contracts and

unexpired leases that benefit the estate and rejecting other executory contracts and unexpired leases that are a burden on the estate. *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs, Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) (noting that section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.").

43.     Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party. 11 U.S.C. § 365(f). Section 365(f)(2)(B) requires, however, that adequate assurance of future performance by an assignee exist. 11 U.S.C. § 365(f)(2)(B). The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment. *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001). Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant. *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

44.     The Stalking Horse Agreement requires, as an integral part of the Sale, the assumption and assignment of certain executory contracts and unexpired leases. It is thus an appropriate exercise of business judgment for the Debtors to agree to assume and assign the contracts and leases as will be required by the Stalking Horse Agreement. Additionally, the Debtors submit that the notice provisions, and the objection deadline for counterparties to raise objections to the assumption and assignment of contracts and leases, as proposed in the Bidding

Procedures Motion, are adequate to protect the rights of counterparties to the Debtors' contracts and leases. Furthermore, the Debtors will demonstrate adequate assurance of future performance at the Sale Hearing.

## Waiver of 14-Day Stay Imposed By Bankruptcy Rules 6004(h) and 6006(d)

45.     The Debtors request that, upon entry of the Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).     The waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is a condition of the Stalking Horse Agreement.     The Debtors respectfully submit that the Court waive the 14-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

46.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Office of the United States Attorney for the District of Delaware; (c) the Securities and Exchange Commission; (d) the Debtors' 20 largest unsecured creditors on a consolidated basis; (e) counsel for the Pre-Petition Lenders and the proposed DIP Lenders; (f) all parties who have asserted a lien or security interest against any of the Assets; and (g) all parties requesting notice. In addition, the Debtors will provide additional notice of the Sale pursuant to the terms of the Bidding Procedures Order. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

47.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Sale Order, substantially in the form annexed hereto as **Exhibit B**, or such other order approving a

sale to such other party that is the successful bidder at the Auction and (ii) grant such other and

further relief as may be just and proper.

**POLSINELLI SHUGHART PC**

June 6, 2011
Wilmington, Delaware

/s/ Christopher A. Ward

Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Del Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com
skatona@polsinelli.com

PROPOSED COUNSEL TO DEBTORS
AND DEBTORS IN POSSESSION

2786647.2