# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Signature Styles, LLC,[1] | ) | Case No. 11-_____ (___) |
| a Delaware limited liability company, | ) | |
| | ) | Joint Administration Pending |
| Debtors. | ) | |

## MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS, (II) APPROVING CERTAIN BIDDING PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) SCHEDULING AN AUCTION AND SALE HEARING

Signature Styles, LLC ("**SSL**") and its related debtor (collectively, the "**Debtors**"), as debtors and debtors in possession in the above-captioned cases, hereby move the Court, pursuant to sections 105, 363, 365 and 503 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an order, attached hereto as Exhibit A (the "**Bidding Procedures Order**"):

    a.    approving proposed bidding procedures (the "**Bidding Procedures**"), as well as proposed bidder protections, in connection with the sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**");

---

[1] The Debtors in these chapter 11 cases, and the last four digits of their respective tax identification numbers, are: Signature Styles, LLC (4502) (Case No. _____) and Signature Style Gift Cards, LLC (8699) (Case No. _____). The location of the Debtors' corporate headquarters is: 711 Third Avenue, 4th Floor, New York, New York 10017.

b. scheduling an auction (the "**Auction**") and a final sale hearing (the "**Sale Hearing**") in connection with the Sale; and

c. approving the form and manner of notice of the Auction and the Sale Hearing, including the form and manner of service of the notice (the "**Auction and Hearing Notice**") attached hereto as Exhibit B, and the notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached hereto as Exhibit C (the "**Assumption and Assignment Notice**").

In support of this Motion, the Debtors incorporate the statements contained in the Declaration of Robert Angart in Support of First Day Relief (the "**Angart Declaration**") filed contemporaneously herewith and further respectfully state as follows:

## JURISDICTION

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a), 363, 365 and 503 of the Bankruptcy Code and Local Rule 6004-1.

## BACKGROUND

3. On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing the above-captioned chapter 11 cases (the "**Cases**"). The factual background regarding the Debtors, including their respective business operations, their capital and debt structure, and the events leading to the

2

DLI-6355846v5

filing of these Cases, is set forth in detail in the Angart Declaration, filed concurrently herewith and fully incorporated by reference.

4. The Debtors are continuing in possession of their respective properties and are operating and maintaining their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No trustee or examiner has been appointed in these Cases, and no creditors' committee has yet been appointed.

### *Events Leading to the Debtors' Bankruptcy Filing and the Proposed Sale*

6. As described in the Angart Declaration, SSL acquired the assets of Spiegel Brands, Inc. and certain of its affiliates (collectively, the "**Spiegel Brands**") at a foreclosure sale conducted in June 2009. The foreclosing lenders, through their investment banker, had conducted a robust marketing process for Spiegel Brands' assets, but SSL was the only party that ultimately submitted a bid for the assets. SSL acquired the assets of Spiegel Brands for a purchase price of $21.7 million.

7. Pursuant to a Credit Agreement (as subsequently amended, the "**Prepetition Credit Agreement**") dated as of June 12, 2009 by and among SSL, as borrower, SS Gift Cards, as guarantor, Zohar II 2005-1 Limited and Zohar III, Limited, as lenders (collectively, the "**Prepetition Lenders**"), and Patriarch Partners Agency Services, LLC ("**PPAS**"), as administrative agent, the Prepetition Lenders financed SSL's acquisition of Spiegel Brands by providing SSL with a term loan in the amount of $21.7 million and a revolver (the "**Revolver**") in the original amount of $5 million.

8. After the acquisition, the Debtors' businesses encountered immediate financial problems as a result of the deteriorating economy and the general decline in retail sales. The Debtors' decreasing revenues and ensuing losses drained their cash resources and limited

3

their ability to ship catalogs or purchase adequate inventory. These handicaps spurred additional sales declines, which further aggravated the Debtors' cash constraints. As of the Petition Date, the Debtors had approximately $50,000 in cash on their books

9. In response to the Debtors' problems, the Prepetition Lenders, over the last two years, entered into a series of amendments to the Prepetition Credit Agreement that cumulatively increased the available commitment under the Revolver from the original $5 million to $17 million as of the Petition Date. As of April 30, 2011, the Debtors had nearly exhausted the Revolver, with an outstanding balance of approximately $16.5 million.[2] The Debtors missed several required monthly interest payments under the Loans and, as a result, events of default exist under the Pre-Petition Credit Agreement. Because the Debtors had not cured these events of default prior to the Petition Date, the Pre-Petition Lenders have no further obligation to make advances under the Pre-Petition Credit Agreement, and, in fact, were unwilling to provide any further prepetition funding to the Debtors.

10. In addition to increasing borrowings under the Revolver, the Debtors also committed to aggressively reduce operating costs. As part of that commitment, the Debtors reduced their workforce from 216 employees to 133. Although recently implemented, these cost-cutting strategies will not be sufficient to restore the Debtors to profitability. The Debtors continue to carry significant legacy liabilities, including leases for warehouse and office space considerably larger than the Debtors actually need. The Debtors' reduced level of operations can simply no longer support their liabilities.

11. For the year 2010, the Debtors had net sales of $119.9 million, losses from operations of $25.6 million and net income of negative $31.1 million. For the three months

---

[2] As of the Petition Date, the amount outstanding under the Revolver, including accrued interest, was approximately $14.59 million.

4

ending March, 2011, net sales were $10.8 million, operating losses were $3.4 million and net income was negative $5.0 million. For the year 2010 and three months ended March 2011, the Debtors were unable to generate sufficient EBITDA to cover their interest expense.

12. The Debtors are overleveraged and unable to sustain business operations. Accordingly, the Debtors have determined that a sale of substantially all of their assets is in the best interests of all stakeholders because it will maximize the value of the Debtors' assets.

13. Prior to the Petition Date, the Debtors hired Mr. Robert Angart as Chief Restructuring Officer and authorized the filing of these bankruptcy cases and the proposed sale process, including the execution of a stalking-horse agreement with Artemiss, LLC ("**Artemiss**"), an acquisition vehicle formed by the Prepetition Lenders. In addition, the Debtors entered into a debtor in possession financing agreement with one of their Prepetition Lenders that will provide the Debtors with sufficient financing to conduct a 60 day marketing and sale process for the Assets.

14. To assist in the marketing and sale of the Assets, the Debtors retained Western Reserve Partners LLC ("**Western Reserve**"), a Cleveland-based investment banking firm with substantial experience in sell-side representations of middle market companies. Since their retention prior to the Petition Date, Western Reserve has contacted approximately 15 potential bidders and identified more than 100 candidates that might potentially have an interest in acquiring the Assets. During the course of these Cases, Western Reserve will supervise the sale process, market the Assets, contact potential bidders, distribute an offering memorandum, establish an electronic data room for prospective bidders to conduct due diligence and generally be available to respond to information requests from potential buyers.[3] The Debtors believe this

---

[3] Concurrently herewith, the Debtors have filed an application, seeking to retain Western Reserve as investment banker in these Cases.

5

coordinated and comprehensive sale process will produce the highest available bid and maximize value for the Debtors' stakeholders.

*The Stalking Horse Agreement*

15. The Debtors have negotiated the terms of an asset purchase agreement (the "**Stalking Horse Agreement**")[4] with Artemiss (the "**Buyer**"), an acquisition entity formed by the Prepetition Lenders, pursuant to which the Buyer has agreed to act as a stalking horse bidder for the sale of substantially all of the Debtors' assets (the "**Sale**"). Concurrently with the filing of this Motion, the Debtors have filed a motion to approve the Sale (the "**Sale Motion**"). The principal terms of the Stalking Horse Agreement are summarized in the Sale Motion.

16. The Stalking Horse Agreement obligates the Debtors to reimburse the Buyer for its reasonable, actual out-of-pocket expenses incurred in connection with the negotiation, preparation, execution, delivery and attempted performance of the Stalking Horse Agreement up to an aggregate amount of $300,000 (the "**Expense Reimbursement**"). The Buyer did not seek and the Stalking Horse Agreement does not provide for a break-up fee. The Expense Reimbursement will be payable in the event that the Debtors' assets are sold to another party and will be paid to the Buyer from the proceeds of the Sale. The Expense Reimbursement will be allowed and paid as an administrative expense claim pursuant to section 503(b)(1) of the Bankruptcy Code.

17. The Stalking Horse Agreement also requires the Debtors to obtain the entry of a bidding procedures order acceptable to the Buyer by June 30, 2011 and a sale order acceptable to the Buyer by August 4, 2011. Further, the Buyer has the right to terminate the Stalking Horse Agreement if the sale has not been consummated by August 5, 2011.

---

[4] A copy of the Stalking Horse Agreement is attached as Exhibit A to the Sale Motion (as defined herein).

18.     The Debtors believe that the sale of substantially all of the Debtors' assets, to the Buyer or a higher and better bidder following the Auction, represents the best possible outcome for these Cases and provides the best opportunity for maximizing value for the Debtors' stakeholders.

## RELIEF REQUESTED

19.     By this Motion, the Debtors seek, pursuant to sections 105, 363, 365 and 503 of the Bankruptcy Code, entry of the Bidding Procedures Order:

(a)     approving (i) the Debtors' proposed Bidding Procedures for marketing the Assets, which procedures are attached as Annex 1 to the Bidding Procedures Order; (ii) the Auction and Hearing Notice; and (iii) the Assumption and Assignment Notice;

(b)     approving the Expense Reimbursement;

(c)     establishing Friday, July 29, 2011 at 4:00 p.m. (Eastern Time) as the deadline for the submission of bids (the "**Bid Deadline**");

(d)     scheduling the Auction, if necessary, no later than Monday, August 1, 2011; and

(e)     scheduling the Sale Hearing for Wednesday, August 3, 2011 to consider the sale of the Assets to the Buyer or such other party that is the successful bidder at the Auction.

### A.     THE PROPOSED BIDDING PROCEDURES

20.     The Debtors are requesting that the Court approve Bidding Procedures for the sale of the Assets with a final sale hearing to occur during the first week of August 2011.[5] The following is a summary of the Debtors' proposed Bidding Procedures.[6]

---

[5]  The form of Bidding Procedures Order contains dates proposed by the Debtors. These dates are subject to the availability of the Court and may change.

[6]  The summary describes each provision of the Bidding Procedures that Local Rule 6004-1 requires a debtor to highlight in a bidding procedures motion.

DLI-6355846v5

21. _Participation Requirements_. Unless otherwise ordered by the Court for cause shown, to participate in the bidding process, each person or entity will be required to deliver (unless previously delivered) the following materials to the Debtors by no later than seven calendar days prior to the Bid Deadline: (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors; and (b) information demonstrating to the Debtors' satisfaction a *bona fide* interest in purchasing, and the financial ability to purchase, the Assets. Each person or entity that timely delivers such materials to the Debtors in form reasonably acceptable to the Debtors is hereinafter referred to as a "**Potential Bidder.**" After a Potential Bidder delivers all of the materials required above, the Debtors will allow each Potential Bidder satisfying the criteria enumerated herein access to the data room.

22. _Determination by the Debtors_. The Debtors, in consultation with any official committee of unsecured creditors appointed in these Cases (the "**Committee**"), will (a) coordinate the efforts of Potential Bidders in conducting their respective due diligence, (b) evaluate bids from Potential Bidders, (c) negotiate any bid made to purchase the Assets and (d) make such other determinations as are provided in the Bidding Procedures. Neither the Debtors nor their representatives will be obligated to furnish any information relating to the Debtors to any person who is not a Potential Bidder. The Debtors will consult with counsel to the Debtors' pre- and postpetition lenders (the "**Lenders**") to the same extent that they are required to consult with the Committee under the Bidding Procedures.

23. _Due Diligence_. The Debtors will establish an electronic data room into which substantial information about the Debtors and their businesses will be deposited. All Potential Bidders will be granted full access to the data room by Western Reserve, the Debtors' investment banker. The Debtors will afford any Potential Bidder such additional access or

information as may be requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate; *provided, however*, that any such additional information that has not previously been furnished to the Buyer must also be distributed to the Buyer. The Debtors may designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access by Potential Bidders. No additional due diligence information will be made available to Potential Bidders after the Bid Deadline.

24. Bid Deadline. On or before the Bid Deadline, a Potential Bidder that desires to make a bid is required to deliver written copies of its bid by facsimile and email to the representatives of the Debtors, the Debtors' counsel, the Committee and the Buyer.

25. Bid Requirements. All bids must include: (a) an offer to acquire the Assets in the form of the Stalking Horse Agreement, marked to show any proposed amendments and modifications to such agreement (the "**Marked Agreement**"); (b) an agreement that the Potential Bidder's offer is binding and irrevocable until 48 hours after the earlier of (i) the consummation of the sale of the Assets to another person or entity, or (ii) 30 days after the Sale Hearing; and (c) a proposed purchase price greater than the aggregate consideration offered by the Buyer pursuant to the Stalking Horse Agreement by an amount of $400,000 (the "**Initial Bid Increment**"), which amount equals the sum of the maximum amount of the Expense Reimbursement plus $100,000. Except for the Stalking Horse Agreement, bids must be accompanied by (a) a certified check or wire transfer in an amount equal to 10% of the cash purchase price set forth in the Marked Agreement payable to the order of the Debtors (a "**Good Faith Deposit**") and (b) written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder and such

other evidence of ability to consummate the transaction as the Debtors may reasonably request. To the extent any Potential Bidder proposes to include non-cash consideration in its bid, such non-cash consideration must be, in the reasonable discretion of the Debtors, freely marketable and such bid shall be accompanied by the form of notes or other type of instrument that would comprise such non-cash consideration. Additionally, a Potential Bidder may not propose to assume the Pre-Petition Term and Revolver Obligations or the DIP Facility Obligations (as such terms are defined in the Stalking Horse Agreement). The Buyer will not be required to post a Good Faith Deposit. The Debtors, in consultation with the Committee, will review each bid received from a Potential Bidder to ensure that it meets the requirements set forth above. A bid received from a Potential Bidder that meets the above requirements will be considered a "**Qualified Bid**" and each Potential Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**." The Stalking Horse Agreement is a Qualified Bid and the Buyer is a Qualified Bidder for all purposes and requirements pursuant to the Bidding Procedures. The Debtors may value a Qualified Bid based upon any and all factors that the Debtors deem pertinent, including, among others: (a) the amount of the Qualified Bid, (b) the risks and timing associated with consummating a transaction with the Potential Bidder, (c) the risks associated with any non-cash consideration in any Qualified Bid, (d) any excluded Assets or executory contracts and leases, and (e) any other factors that the Debtors may deem relevant to the Sale in consultation with the Committee. The Debtors, in their business judgment, and in consultation with the Committee, reserve the right to reject any bid if the bid: (a) is on terms that are more burdensome or conditional than the terms of the Stalking Horse Agreement; (b) requires any indemnification of such Potential Bidder in its Marked Agreement; (c) is not received by the Bid Deadline; (d) includes non-cash consideration that is not freely marketable; or (e) is subject to

any due diligence, financing condition or other contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to purchase the Assets other than as may be included in the Stalking Horse Agreement.

26. <u>Auction Participation</u>. Only the Buyer and each Qualified Bidder are eligible to participate at the Auction. At least one business day prior to the Auction, each Qualified Bidder must inform the Debtors whether it intends to participate in the Auction. The Debtors will promptly thereafter inform in writing each Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all other Qualified Bidders that may participate in the Auction. If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, they will not hold an Auction, the Stalking Horse Agreement will be deemed the Successful Bid (as defined below) and the Buyer will be named the Successful Bidder (as defined below).

27. <u>Auction</u>. If more than one Qualified Bid has been received, the Debtors will conduct the Auction for the sale of the Assets. The Debtors propose that the Auction take place at 10:00 a.m. (Eastern Time) on Monday, August 1, 2011 at the offices of Polsinelli Shughart PC, 222 Delaware Avenue, Suite 1101, Wilmington, DE 19801, or such other time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders. The Auction will be conducted openly and will be transcribed or videotaped, at the Debtors' option. The bidding shall start at the amount offered in the highest Qualifying Bid, plus $100,000 and will continue in increments of at least $100,000 until the bidding ceases. Any bid submitted by the Buyer at the Auction will include a credit equal to $300,000, which equals the maximum Expense Reimbursement. The Debtors may alter the Bidding Procedures at the

11

DLI-6355846v5

Auction if, in their reasonable judgment, in consultation with the Committee, such alteration will better promote the goals of the Auction. Immediately prior to the conclusion of the Auction, the Debtors, in consultation with the Committee, will: (a) review each bid made at the Auction on the basis of financial and contractual terms and such other factors relevant to the sale process, including those affecting the speed and certainty of consummating the Sale; (b) determine the highest or best bid for the Assets at the Auction (the "**Successful Bid**"); and (c) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name of the maker of the Successful Bid (the "**Successful Bidder**"). All bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale of the assets and the construction and enforcement of the Stalking Horse Agreement. After determining the Successful Bid, the Debtors may determine, in their reasonable business judgment, in consultation with the Committee, which Qualified Bid is the next best bid (the "**Next Best Bid**").

28. <u>Acceptance of Qualified Bids</u>. The Debtors may reject at any time before entry of the Sale Order any bid, other than the Stalking Horse Agreement, that, in the Debtors' reasonable judgment, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale or (c) contrary to the best interests of the Debtors and their estates. The Debtors' selection and submission to this Court of the selected bid as the Successful Bid will not constitute the Debtors' acceptance of the bid. The Debtors will have accepted a Qualified Bid only when such Qualified Bid has been approved by the Court at the Sale Hearing. If the Successful Bidder does not close the Sale by the date agreed to by the Debtors and the Successful Bidder, then the

Debtors shall be authorized, but not required, to close with the party that submitted the Next Best Bid (the "**Next Best Bidder**"), without a further court order.

29. No Fees for Potential Bidders or Qualified Bidders. Except for the Buyer and limited to the extent described herein, Potential Bidders or Qualified Bidders will not be allowed any breakup, termination or similar fee. Moreover, neither the tendering of a bid nor the determination that a bid is a Qualified Bid will entitle a Potential Bidder or Qualified Bidder to any breakup, termination or similar fee and all Potential Bidders and Qualified Bidders waive any right to seek a claim for substantial contribution.

30. Return of Good Faith Deposit. The Good Faith Deposits of all Potential Bidders shall be held in escrow by the Debtors, and shall not become property of the Debtors' estates. The Good Faith Deposit of each Potential Bidder shall be returned to such Potential Bidder within 48 hours after the earlier of (a) entry of the Court order approving the Sale of the assets to another person or entity, and (b) 30 days after the Sale Hearing.

31. The Debtors believe that the proposed Bid Procedures provide an appropriate framework for selling the Assets and will enable the Debtors to fully review, analyze and compare all Bids received to determine which Bid is in the best interests of the Debtors' estates and creditors.

## B. PROPOSED STALKING HORSE BIDDING PROTECTIONS

32. As part of the Bidding Procedures Order, the Debtors are also requesting approval of the provisions of the Stalking Horse Agreement regarding the payment of the Expense Reimbursement on the terms and conditions set forth in the Stalking Horse Agreement. The Buyer is not requiring a break up fee, as is typically approved in connection with the sale of substantially all of a debtor's assets pursuant to section 363 of the Bankruptcy Code, but is not willing to serve as a stalking horse bidder without the inclusion of the Expense Reimbursement

13

provisions in the Stalking Horse Agreement. If approved by this Court, the Debtors would be required to pay the Buyer up to $300,000 in Expense Reimbursement, in the event that the Expense Reimbursement is payable under the terms of the Stalking Horse Agreement.

33. The Debtors submit that the proposed Expense Reimbursement will not chill bidding, is reasonable, and will enable the Debtors to maximize the value of their estates. The Stalking Horse Agreement has established a price floor and will initiate a comprehensive sales process, allowing the Debtors to both maximize the value of their estates and evaluate properly other competing bids that may be materially higher or otherwise better than the Buyer's bid. In addition, the $300,000 cap on the Expense Reimbursement represents less than one percent of the value of the Stalking Horse Agreement. This percentage is far lower than the cumulative breakup fees and expense reimbursements approved in other chapter 11 cases in this jurisdiction. *See In re PCAA Parent LLC.*, Case No. 10-10250 (MFW) (Bankr. D. Del February 17, 2010) (approving $3.066 million break-up fee and $750,000 expense reimbursement in connection with $111.5 million sale, (3.4%)); *In re Nortel Networks Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee and $400,000 expense reimbursement in connection with $17.65 million sale (5.9%)); *In re Tallygenicom, L.P.*, Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving $750,000 break-up fee and $750,000 expense reimbursement in connection with $36.6275 million sale (4.1%)); *In re Tweeter Home Entm't Group, Inc.*, Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007) (authorizing debtors to offer up to 3% break-up fee if asset purchase agreement executed by specified deadline); *In re Decora Indus., Inc.*, 2002 WL 32332749 (D. Del. 2002) (Farnan, J.) (appellate court approving 3% break☐up fee).

C. **PROPOSED NOTICE OF THE SALE HEARING**

34. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 20 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested in the Sale Motion. The Debtors propose that the deadline for objecting to approval of the proposed Sale shall be 4:00 p.m. (Eastern Time) on Wednesday, July 27, 2011.

35. Within two business days after entry of the Bidding Procedures Order, the Debtors will serve the Auction and Hearing Notice by first-class mail, postage prepaid upon the following parties: (a) the office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (b) counsel to the Committee; (c) the Debtors' twenty largest unsecured creditors on a consolidated basis, as identified in the Debtors' chapter 11 petitions, (d) all parties who have asserted a lien or security interest against any of the Assets, (e) all parties to the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (the "**Assumed and Assigned Agreements**"); (f) applicable taxing authorities, including the Internal Revenue Service; (g) the Debtors' current employees; (h) all parties requesting notice in these Chapter 11 Cases; and (i) all other known potential creditors in these Chapter 11 Cases. The Auction and Hearing Notice shall indicate that the Sale Motion and the Stalking Horse Agreement can be obtained on the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, http://www.epiq11.com/. In addition, the Debtors will serve the Sale Motion, including a copy of the Stalking Horse Agreement, on those persons in categories (a) through (d), above. Further, within two business days after entry of the Bidding Procedures Order, or as soon as practicable thereafter, the Debtors will place a publication

version of the Auction and Hearing Notice for one day in the national edition of *The Wall Street Journal*.

36. The Auction and Hearing Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Sale Motion once they are set by the Court, and, will therefore, comply with Bankruptcy Rule 2002(c). The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Assets. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

D. **PROPOSED NOTICE OF THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

37. Additionally, the Debtors, as part of the Sale, intend to assume and assign certain executory contracts and unexpired leases. As soon as practicable, but no later than Friday, June 17, 2011, the Debtors will file a schedule of cure obligations (the "**Cure Schedule**") for the Assumed and Assigned Agreements. The Cure Schedule will include a description of each Assumed and Assigned Agreement potentially to be assumed and assigned under the Stalking Horse Agreement or a Marked Agreement, as applicable, and the amount, if any, the Debtors believe is necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "**Cure Costs**"). A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the nondebtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Court. The Debtors propose that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, objections relating to adequate assurance of future performance or to the Cure Costs set forth on such schedule,

16

must be in writing, filed with the Court, and be actually received on or before Tuesday, July 19, 2011 by Signature Styles, LLC, 711 Third Avenue, 4th Floor, New York, New York 10017 (Attn: Robert Angart), with copies to (a) counsel to the Debtors, Polsinelli Shughart PC, 222 Delaware Avenue, Suite 1101, Wilmington, DE 19801 (Attn: Christopher A. Ward); (b) counsel to the Buyer, Jones Day, 2727 N. Harwood Street, Dallas, TX 75201, (Attn: Gregory M. Gordon and Daniel B. Prieto); (c) the office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801, and (d) once it is formed, counsel to the Committee (the "**Notice Parties**"); *provided, however*, that in the event the Auction results in a Successful Bidder other than the Buyer, the Debtors shall file a notice identifying such Successful Bidder, and serve such notice upon each party identified in the Cure Schedules, and the deadline for objecting to the assignment of the Assumed and Assigned Agreements to such Successful Bidder on the basis of adequate assurance of future performance will be the commencement of the Sale Hearing. Any such objection shall set forth a specific default in any Assumed and Assigned Agreements and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Schedule.

38. If no objections are received, then the Cure Costs set forth in the Cure Schedule will be binding upon the nondebtor parties to the Assumed and Assigned Agreements for all purposes in these chapter 11 cases and will constitute a final determination of the total Cure Costs required to be paid by the Debtors in connection with the assumption and assignment of the Assumed and Assigned Agreements. In addition, all counterparties to the Assumed and Assigned Agreements will (a) be forever barred from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtors and the Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption

17

and Assignment Notice; (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

39. Where a nondebtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Costs (the "**Disputed Cure Amount**"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the Successful Bidder's consent to such consensual resolution, the Debtors shall promptly provide the Committee and the Successful Bidder notice and opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or at such other date and time as may be fixed by this Court. All other objections to the proposed assumption and assignment of an Assumed and Assigned Agreement will be heard at the Sale Hearing. The Debtors intend to cooperate with counterparties to Assumed and Assigned Agreements to attempt to reconcile any differences with respect to a particular cure amount.

40. The Debtors request that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code. *See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor

deemed to consent); *Pelican Homestead v. Wooten (In re Gabeel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. *See* 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## NOTICE

41. No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Office of the United States Attorney for the District of Delaware; (c) the Securities and Exchange Commission; (d) the Debtors' 20 largest unsecured creditors on a consolidated basis; (e) counsel for the Pre-Petition Lenders and the proposed DIP Lenders; (f) all parties who have asserted a lien or security interest against any of the Assets; (g) all parties to the Assumed and Assigned Agreements; and (h) all parties requesting notice. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

42. No prior request for the relief sought in this Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request the Court to enter the Bidding Procedures Order granting (i) the relief requested herein and (ii) such other and further relief to the Debtors as the Court may deem proper.

June 6, 2011
Wilmington, Delaware

**POLSINELLI SHUGHART PC**

/s/ Christopher A. Ward
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Del Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com
skatona@polsinelli.com

PROPOSED COUNSEL TO DEBTORS
AND DEBTORS IN POSSESSION