**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------------- X

In re:

Signature Styles, LLC,
  a Delaware limited liability company,

                               Debtors.

Chapter 11

Case No.: 11-11733 (KG)

RE: Docket #'s 9 and 45

------------------------------------------------------------------- X

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE DEBTORS' MOTION FOR A FINAL ORDER (I) AUTHORIZING THE
DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) GRANTING
CERTAIN LIENS, AND (III) MODIFYING THE AUTOMATIC STAY**

The Official Committee of Unsecured Creditors (the "**Committee**") of Signature Styles, LLC and its affiliated debtor, Signature Styles Gift Cards, LLC (collectively, the "**Debtors**"), by and through its proposed lead and local counsel, Cooley LLP and The Rosner Law Group LLC, hereby submits this objection (this "**Objection**") to the Debtors' motion (the "**DIP Motion**") requesting authority to, *inter alia*, obtain postpetition financing from Patriarch Partners Agency Services, LLC ("**Patriarch**") and Zohar III Limited ("**Zohar III**," and collectively with Patriarch, the "**DIP Lender**"), and respectfully represents as follows:

**I.**

**PRELIMINARY STATEMENT[1]**

1. At the behest of Patriarch, the Debtors commenced these chapter 11 cases not to maximize the value of their assets, but to cleanse themselves of their unsecured debt while transferring their assets to their Patriarch affiliates (who are also the (i) holders of the Debtors' equity, (ii) prepetition lenders, and (iii) proposed DIP Lender) for no cash consideration. The proposed sale process, along with aspects of the postpetition financing, are not designed to

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them below or in the DIP Motion.

1730519 v4/NY

benefit the Debtors' estates or their creditors; they are designed to allow Patriarch to purchase the Debtors' assets cheaply, without any true market test, then realize the future profits of the business for its sole benefit.

2. A critical step towards Patriarch's improper goal is the entry of the proposed final postpetition financing order (the "**Final DIP Order**"). If the Final DIP Order is entered, it will all but make it a fait accompli that Patriarch will purchase the Debtors' assets while providing zero cash consideration to the Debtors' estates. Taken together, the Sale and DIP Motion, among other things:

(i) are premised on a "credit" bid structured to block any competing bids;

(ii) provide for a truncated sale process designed to limit, or worse foreclose, any expressions of interest in the Debtors' assets; and

(iii) ultimately hand the Debtors' assets over to Patriarch without permitting any meaningful investigation into the validity, extent, priority or character of its purported secured indebtedness or the 2009 LBO.

3. The suffocating timing restrictions and additional negative attributes of the postpetition financing imposed by Patriarch, discussed below, are even more egregious in light of the Debtors' postpetition performance. When the Debtors initially requested interim authority to incur postpetition secured debt, they purported to have approximately $50,000 in cash on their books. Circumstances have changed. The Debtors' postpetition performance has exceeded expectations, resulting in a permanent positive cash variance potentially sufficient to avoid the Debtors' need for the DIP Facility. Indeed, the Debtors have yet to draw on the DIP Facility thus far. Without the need for postpetition financing, the Debtors will not be compelled to:

- Sell their assets at break-neck speed without any true marketing process;
- Pay Patriarch a Commitment Fee for the unused amount of the DIP Facility;
- Grant liens on their previously unencumbered assets; and

- Unduly restrict the Committee's ability to investigate Patriarch's liens and claims and the 2009 LBO.

Patriarch should not be permitted to eradicate any chance of recovery for creditors by forcing the Court to approve what, at this time, may only be called a fictitious financing facility for improper purposes. At a minimum, this Court should defer entering the Final DIP Order until the Debtors can demonstrate their need for postpetition financing, rather than use cash collateral until a sale is consummated.

4. If this Court finds that the DIP Facility is necessary, the Committee nonetheless objects because the DIP Facility will leave these estates administratively insolvent while permitting Patriarch to consummate a sale to itself and effectively retain its secured indebtedness and equity interests in the Debtors.[2] While the Committee does not oppose a sale of the Debtors' assets, that sale must be conducted in a manner designed to benefit the Debtors' estates – not just Patriarch – and any attendant financing facility should be appropriately tailored to support, not suffocate the Debtors' marketing and sale efforts. Accordingly, the Sale Deadlines and August 15th maturity date provided for in the DIP Credit Agreement must be modified so that the Debtors have adequate time to conduct a proper sale process. Not only will additional time assist in effectuating a proper sale process, but it will also

---

[2] These argument are set forth more fully in the Committee's pleadings filed in connection with the Sale: **(i)** *Motion of the Official Committee of Unsecured Creditors for an Order (A) Authorizing its Financial Advisor to Supplement the Sale Process and Solicit Alternative Proposals Using, Inter Alia, the Debtors' Confidential Information, (B) Directing the Debtors to Provide Cooperation in Connection With Such Efforts, and (C) Authorizing and Directing the Debtors to Maintain and Administer Customer Programs and Honor Prepetition Obligations Related Thereto in the Ordinary Course*; **(ii)** *Objection of Official Committee of Unsecured Creditors to Debtors' Motion for Order (I) Approving Bidding Procedures for the Sale of Substantially all of their Assets, (I) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases and (IV) Scheduling an Auction and Sale Hearing*; and **(iii)** *Motion of the Official Committee of Unsecured Creditors for an Order Pursuant to Bankruptcy Rule 2004 (I) Directing the Production of Documents and Witnesses by Patriarch and the Debtors and (II) Authorizing the Issuance of Subpoenas*.

enable the Committee to perform a proper investigation of the character and validity of Patriarch's purportedly secured indebtedness and the 2009 LBO.

5. In addition to the timing restrictions imposed by Patriarch, in its capacity as DIP Lender, the proposed Final DIP Order is rife with unwarranted advantages crafted for Patriarch's benefit. Specifically, the proposed Final DIP Order contains a waiver of the estates' rights under section 506(c) of the Bankruptcy Code which is particularly inappropriate when the Budget clearly demonstrates that these estates will be left administratively insolvent after the Sale. Further objectionable provisions of the proposed Final DIP Order include, but are not limited to:

(a) **Liens on Unencumbered Property.** The Committee objects to the provisions that, *inter alia*, (i) grant liens and super-priority claims on previously unencumbered assets as DIP Collateral because the DIP Lender proposes to provide financing to fund a process that benefits itself in its capacity as equity holder, Prepetition Lender and Stalking Horse. The provision of de minimis financing – the Debtors are projected to borrow no more than $2 million during this case - should not give the DIP Lender carte blanche to take the remaining assets from what are already thin estates. Indeed, given the Debtors' positive postpetition performance, the Debtors' projected borrowings are expected to decrease considerably, if not be eliminated altogether.

(b) **Undue Restrictions on Committee Investigation Rights Must Be Eliminated**.

(i) **Challenge Deadline.** The Committee objects to the establishment of any time bar (other than any applicable statute of limitations) to bring claims or causes of action against the Debtors' lenders, including, without limitation, causes of action based on theories of fraudulent conveyance, recharacterization and equitable subordination. At a minimum, the Challenge Deadline should be extended to August 17, 2011 (60 days from Committee formation) to permit the Committee to conduct a thorough investigation and, if necessary, commence an adversary proceeding against Patriarch.

(ii) **De Minimis Budgeted Amount for Committee Professionals**. The Committee is the only "non-Patriarch" party representing the estates in this case. It's thus the only neutral estate representative (i) protecting creditors during the sale process and (ii) investigating Patriarch's 2009 leveraged buyout of the Debtors' assets, which, at the time, saddled the Debtors with in excess of $21 million of purportedly secured debt (the "**2009 LBO**"). The budgeted amount of just $450,000 for all of the Committee's professionals during the course of this case effectively handcuff's

> the Committee's ability to pursue what may be the only avenues of recovery for its constituency.

> (iii) **Inadequate Funding in the event of a Termination Event**. The Committee objects to the $15,000 Termination Date Loan payable to the Committee's professionals in the event the DIP Credit Agreement is terminated. That de minimis amount does not allow the Committee professionals to adequately represent their client, in the wake of a Termination Event.

> (c) **506(c) Waiver**. As highlighted above, the Committee objects to the Debtors' waiver of their rights under section 506(c) of the Bankruptcy Code (Interim DIP Order ¶ 8). There is no justification for this waiver in a case where the DIP Facility fails to provide for administrative solvency of the Debtors' estates upon consummation of the Sale to an affiliate of the DIP Lender.

> (d) **Reimbursement of the DIP Lender's Professional Fees.** The provision for payment of fees and expenses of professionals engaged by the DIP Lender (the "**DIP Lender's Professionals**") violates section 506(b) of the Bankruptcy Code. Under section 506(b), the Bankruptcy Court has the power to review the reasonableness of any fees or expenses charged to the estates. The Debtors and the DIP Lender cannot take this power away from this Court (Interim Order, ¶ 15(b)). To the extent that the DIP Lender asserts a claim for fees and expenses under section 506(b) or the terms of any relevant loan document, such request for fees and expenses should be subject to the reasonableness standard under section 330 of the Bankruptcy Code and the U.S. Trustee Guidelines.

> In any event, any fees payable to the DIP Lender's Professionals should only be permitted on account of their work in connection with the DIP Facility; not in their role representing the Prepetition Lenders and /or the Stalking Horse. To make certain that the DIP Lender's professional fee expenses are only paid for such work, such professionals should be required to serve the Committee with monthly invoices and time records providing reasonable detail regarding the tasks performed.

**II.**

**BACKGROUND**

A. **General Case Background**

6. On June 6, 2011 (the "**Commencement Date**"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. On June 17, 2011, the Office of the United States Trustee for the District of Delaware appointed the Committee, consisting of the following five members: (i) Experian Marketing Solutions Inc., (ii) Google, Inc., (iii) Gould Paper Corp., (iv) Hearst Communications, and (v) X+1. That same day, the Committee met and resolved to employ Cooley LLP as its lead counsel. Subsequently the Committee resolved to employ The Rosner Law Group LLC as its local counsel and FTI Consulting as its financial advisors.

8. The filings in this case, together with preliminary documents obtained by the Committee, make clear that the Debtors are fully integrated with and completely controlled by Patriarch, which is, in turn, controlled by one person: Ms. Lynn Tilton. To wit:

- The Debtors' equity is held by Zohar III, an investment fund managed by companies whose collateral manager is related to Patriarch.[3]

- The Debtors' prepetition secured lenders, Zohar II 2005-1 Limited and Zohar III (collectively, the "**Prepetition Lenders**"), are investment funds managed by companies whose collateral manager is related to Patriarch.[4]

- The Debtors propose to obtain postpetition financing from Zohar III.[5]

- The proposed purchaser for the Debtors' assets, Artemiss, LLC (the "**Stalking Horse**"), was formed by an affiliate of the Prepetition Lenders.[6]

- Ms. Lynn Tilton serves as Chief Executive Officer and sole Principal of Patriarch Partners, LLC and its affiliated entities.[7]

---

[3] The collateral manager of Zohar III is Patriarch Partners XV, LLC. See Unanimous Written Consent of Members of Signature Styles, LLC, filed with the Debtors' Petition. Docket No. 1.

[4] See ¶ 12 and 15 of *Declaration of Robert Angart in Support of Chapter 11 Petitions and First Day Pleadings*. Docket No. 2.

[5] See ¶ 10, DIP Motion. Docket No. 9.

[6] See ¶ 23 of *Declaration of Robert Angart in Support of Chapter 11 Petitions and First Day Pleadings*. Docket No. 2.

[7] See http://patriarchpartners.com/our_team.

Based on the foregoing, the Debtors, the Prepetition Lenders, the DIP Lender and the Stalking Horse are each under the management and control of Patriarch and Ms. Tilton. Consequently, Patriarch and Ms. Tilton fully control all aspects of the Debtors' bankruptcy case.

### B. The Debtors' Capital Structure

9. Prior to the Commencement Date, the Debtors were party to that certain Credit Agreement dated as of June 12, 2009 (the "**Prepetition Credit Agreement**") with (i) Zohar II 2005-1 Limited, as term loan lender, and (ii) Zohar III, as revolving lender.

10. As of the Commencement Date, the Debtors stipulate that they owe the Prepetition Lenders **$37.24 million** ($14.6 million under the revolver and $22.64 million under the term loan) plus $4,000 under letters of credit issued under the revolver (collectively, the "**Prepetition Secured Debt**"). See Interim DIP Order, ¶ E.(iii).

11. The Prepetition Lenders' debt is purportedly secured by a lien on substantially all of the Debtors' assets, including equipment, inventory, capital stock (other than certain capital stock of foreign subsidiaries), accounts, deposit accounts, chattel paper, promissory notes, trademarks, copyrights, patents, other intellectual property and commercial tort claims and the proceeds and products of any of the foregoing (collectively, the "**Prepetition Collateral**").

### C. The DIP Facility

12. The Debtors filed the DIP Motion on the Commencement Date, seeking, *inter alia*, interim and final authority to obtain postpetition financing pursuant to a Debtor-In-Possession Credit Agreement (the "**DIP Credit Agreement**") providing for a $7 million senior secured, super-priority revolving credit facility (the "**DIP Facility**"). Docket No. 9.

13. On June 8, 2011 (the "**Interim DIP Hearing**"), this Court entered an order (the "**Interim DIP Order**") granting the DIP Motion on an interim basis, and scheduled a hearing to consider approval of the DIP Motion on a final basis for June 30, 2011. Doc. No. 45.

14. The salient provisions of the DIP Credit Agreement and Budget include:

- A $7 million extension of credit to the Debtors. The budget attached to the DIP Motion (the "**Budget**") projected that the Debtors would only borrow approximately $2 million through September 3, 2011, with the majority of such funding being used for restructuring costs. See DIP Credit Agreement, Exhibit B (the Budget). Given the Debtors' positive postpetition performance, the projected borrowings are expected to decrease considerably, if not be eliminated altogether.

- A maturity date of August 15, 2011, just 70 days after the Commencement Date. See DIP Credit Agreement, Schedule 2.1.

- Events of Defaults including:

  - the Debtors fail to obtain entry of the (i) Bidding Procedures Order by **June 30, 2011** and (ii) Sale Order by **August 4, 2011** (collectively, the "**Sale Deadlines**"); and

  - this Court approves the sale of any material assets of the Debtors to a purchaser other than Patriarch. See DIP Credit Agreement, § 8.1(n)(xiv) and (xv) and Interim DIP Order, ¶13(a).

- $450,000 for all of the Committee's professionals fees and expenses during the case plus post-termination carveout funds limited to all accrued but unpaid (and subsequently allowed) professional fees, costs and expenses as of the Termination Date of (i) counsel for the Debtors plus $25,000, (ii) the Committee's professionals plus $15,000, and (iii) the DIP Lenders' professionals; provided, however, that the aggregate amount of (i) fees and expenses payable to (a) counsel for the Debtors and (b) the Committee's professionals and (ii) United States Trustee fees may not exceed $1.4 million.[8] See DIP Credit Agreement, § 2.1(d).

- Commitment Fee of 1.5% of the actual daily unused amount of the DIP Facility (payable in arrears). The Budget indicates that the Debtors will pay the DIP Lenders $29,265 on account of the Commitment Fee during the first 13 weeks of the case. The aggregate fees payable to the DIP Lenders for borrowing $2 million during the duration of the case would be $105,000, equating to 5% of the total borrowings. The Debtors are also obligated to pay the reasonable fees and expenses of the DIP Lenders, including professional fees, monitoring and appraisal fees, and accounting and collateral examination fees. See DIP Credit Agreement, § 2.8.

---

[8] The "**Termination Date**" is the earlier to occur of (i) the Maturity Date, (ii) the date of termination of the DIP Facility upon an event of default, and (iii) conversion of the chapter 11 case to a case under chapter 7 of the Bankruptcy Code.

**III.**

**OBJECTION TO ENTRY OF THE PROPOSED FINAL DIP ORDER**

**1. The Debtors Have Not Established Their Need for Additional Financing at this Time**

15. At the Interim DIP Hearing, the Debtors sought to justify their request for financing based upon a purported liquidity crises which left them with just $50,000 in cash on their books.[9] Since the Interim DIP Hearing, the Debtors have outperformed their Budget and benefited from certain other permanent positive cash variances, resulting in a greater than projected cash position. The Debtors have thus yet to tap into their DIP Facility. Given the unexpected boost to the Debtors' cash position, a boost which is not just short term, the Debtors should revisit their need to enter into the DIP Facility and consider utilizing cash collateral as a bridge to the Sale.

16. A court should not approve postpetition financing if its primary purpose is to benefit or improve the position of a particular secured lender. See, e.g., In re Aqua Assocs., 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); cf. In re Roblin Indus., 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (Court should only approve postpetition financing if it is "in the best interest of the general creditor body."). Here, Patriarch should not be permitted to eradicate any chance of recovery for creditors by forcing the Court to approve what, at this time, may only be called a fictitious financing facility serving only to:

(i) require the Debtors to sell their assets without any true marketing thereof;

---

[9] See ¶ 21 of *Declaration of Robert Angart in Support of Chapter 11 Petitions and First Day Pleadings*. Docket No. 2.

(ii) collect additional fees for minimal and potentially unnecessary additional liquidity; and

(iii) insulate Patriarch from a meaningful investigation of its liens and claims.

Indeed, the proposed DIP Facility is nothing more than a vehicle created by Patriarch to compel the Debtors to sell their assets without providing any meaningful opportunity for the market to weigh in on the value of the Debtors' assets. Left unchallenged, Patriarch will reacquire the Debtors' assets without providing any cash consideration to the Debtors' estates, let alone any hope for recovery by any non-Patriarch creditors.

17. At a minimum, this Court should defer entering the Final DIP Order until the Debtors can demonstrate why cash collateral alone is insufficient to sustain their operations until a sale is consummated. If this Court permits the Debtors to enter into the proposed DIP Facility, the Committee is compelled to object to certain aspects of the proposed DIP Facility and Final DIP Order. The specific grounds for the Committee's objection, or the objectionable provisions of the proposed DIP Facility, are set forth below.

## 2. **The DIP Credit Agreement Was Not Negotiated In Good Faith**

18. The DIP Credit Agreement was not negotiated by an independent fiduciary exercising its sound business judgment on behalf of the Debtors, but rather was dictated by Patriarch, acting in every role of the transaction – Debtors' management, Debtors' equity holder, pre-and post-petition lender, and Stalking Horse for the Debtors' assets. Accordingly, the Court must give heightened scrutiny to the Debtors' request to incur postpetition secured debt. See, e.g., In re Summit Global Logistics, Inc., 2008 WL 819934, * 9 (Bankr. D.N.J. Mar. 26, 2008) ("The Debtors bear the burden of proving that they have satisfied the … heightened scrutiny required by non-bankruptcy law for insider transactions."); cf. Weinberger v. UOP Inc., 457 A.2d 701 (Del. 1983) (in a non-bankruptcy setting, transactions with corporate insiders are subject to a high degree of scrutiny).

19. Although the Debtors allege that the DIP Credit Agreement was negotiated in good faith, "good faith negotiations" require honest and sincere efforts to engage in discussions and pursue reasonable possibilities. See Elliott v. Staron, 46 Conn. Supp. 38, 48, 735 A.2d 902, 909 (1997). As the person on every side of the negotiating table, Patriarch was hopelessly conflicted and in a position to simply dictate terms that suited its needs, in each of its roles, without any independent party protecting the Debtors' interests. See, e.g., In re St. Mary Hospital, 86 B.R. 393, 551 (Bankr. E.D.Pa. 1988) (denying debtor's request for financing because proposed lender was not an outside lender but a "puppeteer of a marionette-debtor" who had tailored the debtor's emergency itself for its own economic benefit). It is undisputed that the DIP Facility was not subject to any market test. See In re The Colod Group, Inc., 324 B.R. 208, 219 (Bankr. W.D.N.Y. 2005) (denying motion for postpetition financing where the proposed financing "did not represent terms negotiated in any form of open market."). Indeed, at the first day hearings, the Debtors conceded that they did not attempt to solicit bids for postpetition financing from anyone other than the Prepetition Lenders. See Transcript of Hearing, dated June 6, 2011, p. 28-29 ("We made a decision not to go out and look for other financing.").

20. In determining whether to approve a debtor's request to incur postpetition financing, courts must balance the needs of the debtor against the rights and expectations of its creditors, by focusing on financing terms that would: (i) tilt the conduct of the bankruptcy case; (ii) prejudice, at an early stage, the rights that the Bankruptcy Code confers for the benefit of all creditors, and (iii) leverage the chapter 11 process by preventing motions by parties-in-interest from being decided on their merit. In re Ames Dept. Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (citing In re Tenney Village Co., 104 B.R. 562, 568 (Bankr. D.N.H. 1989) ("Under the guise of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage

working for the Bank, seize control of the reins of reorganization, and steal a march on other creditors ….")).

21.     The primary purpose of the DIP Facility is the imposition of rapid Sale Deadlines and Maturity Date, thereby insulating Patriarch from a meaningful challenge in the sale process. As a result, the proposed DIP Credit Agreement would tilt the conduct of the case by pre-ordaining a rapid sale of the Debtors' assets to Patriarch under procedures designed to chill bidders and permit the insider/lender to obtain the Debtors' assets without any market test.[10]

### 3.     **The Sale Deadlines Should be Extended**

22.     The proposed DIP Facility is Patriarch's first step to ensure the Sale to its affiliate is the Debtors only option. Indeed, the DIP Credit Agreement provides that it is an Event of Default if:

- the Debtors fail to obtain entry of the (i) Bidding Procedures Order by **June 30, 2011** and (ii) Sale Order by **August 4, 2011**; or
- this Court approves the sale of any material assets of the Debtors to a purchaser other than Patriarch. See DIP Credit Agreement, § 8.1(n)(xiv) and (xv) and Interim DIP Order, ¶13(a).

In any event, the DIP Credit Agreement matures on August 15, 2011, just 70 days after the Commencement Date, thereby mandating a fast resolution of this case, even if the rush to resolution fails to maximize the value of the Debtors' assets.

23.     These onerous terms effectively prevent the Committee or any other party from seeking an alternative transaction unless the DIP Lender agrees to waive the protections provided by the Final DIP Order. Through the DIP Credit Agreement, Patriarch should not be

---

[10] Another issue raised by Patriarch's connections with, and control over, the Debtors is how the Sale process will be run. While the Committee addresses this issue in detail in its Sale related pleadings, the Committee is compelled to address the issue in the context of the DIP Motion because of the DIP Credit Agreement's requirement that the Debtors provide the DIP Lender with all bids and any other Sale related information. See DIP Credit Agreement, § 5.1(s). Because the Debtors are hopelessly conflicted given the incestuous relationship between Debtors, equity, the Prepetition Lenders, the DIP Lender, and the Stalking Horse, appropriate firewalls must be implemented to assure that Patriarch, Ms. Tilton and the DIP Lender receive no information about bids other than that provided to all bidders so that a level playing field is maintained.

permitted to eradicate any chance of a meaningful sale process designed to determine the true value of the Debtors' assets. The Committee thus objects to the provisions of the Final DIP Order that force the Debtors to sell all of their assets in less than 60 days after the Commencement Date without any indication that the Debtors have meaningfully marketed their assets on a pre-petition basis to ascertain their true worth.

24. Moreover, the Sale Deadlines fail to address the potential for the Committee to challenge the Prepetition Secured Debt which, if successful, could dramatically alter the analysis of the "consideration" being provided by the Stalking Horse. The Committee has a fiduciary duty to conduct an investigation into the validity, extent, priority and character of the prepetition indebtedness of the Debtors. The fact that Patriarch acquired the Debtors' assets less than two years ago in the 2009 LBO essentially requires an investigation. It may be that the Prepetition Lenders' liens do not extend to certain assets, and/or that the Prepetition Lenders' claim should be recast as equity rather than debt. If a Committee challenge results in a determination that all or a portion of the Prepetition Secured Debt is under-secured and/or should be recharacterized as equity, the Debtors will have lost valuable time in these proceedings being forced to pursue an exit strategy focused solely on a stalking horse bid whose sole source of consideration is the assumption of secured debt. The Debtors would find themselves with a "credit" bid of zero value (as opposed to questionable value) without sufficient financing to meaningfully explore other sale alternatives given the DIP Facility's August 15, 2011 Maturity Date.[11]

25. Based on the foregoing, the Sale Deadlines and related default provisions must be modified to accommodate a meaningful investigation by the Committee, and a meaningful marketing process to make certain that the Debtors' assets are exposed to the marketplace and

---

[11] Of course this assumes that the Committee could somehow complete its investigation and commence a challenge against the Prepetition Lenders by July 27, 2011, which borders on impossible. The challenge period should be extended to no earlier than August 17, 2011, which is 60 days from formation of the Committee.

the credit bid of secured debt is actually secured debt. In particular, the Sale Deadlines contained in the DIP Credit Agreement should be modified as follows:

| Debtors' Proposed Sale Deadline | Committee's Proposed Sale Deadline | Event |
|---|---|---|
| **July 27, 2011** | **August 26, 2011** | Objection Deadline for Sale Motion |
| **July 29, 2011** | **August 29, 2011** | Bid Deadline |
| **August 1, 2011** | **September 1, 2011** | Auction |
| **August 3, 2011** | **September 8/9, 2011** | Sale Hearing |

4. **The DIP Lender is Not Entitled to Liens on Unencumbered Assets When it is Providing Minimal, if any, Financing**

26. The DIP Lender requests all of the Debtors' assets as collateral for the DIP Facility, including leasehold proceeds, in exchange for what amounts to minimal bridge financing towards an expedited sale process, the purpose of which is to make certain that Patriarch effectively retains its equity interest in the Debtors' business. Indeed, once the sale closes, the DIP Facility will terminate and the estates will have no ability to pay for accrued and unpaid obligations or the wind-down and closure of these chapter 11 cases.

27. Even if the Debtors establish their need for postpetition financing, that need should not serve as an opportunity for the DIP Lender to subsume all remaining unencumbered assets. Indeed, as all parties are aware, the DIP Lender is simply providing financing to fund a process that benefits itself.

5. **The Committee Must Be Provided With the Ability to Complete a Meaningful Investigation in a Compressed Timeframe**

28. The proposed Final DIP Order attempts to limit the Committee's ability to investigate the validity, extent, perfection, priority or enforceability of the secured claims of the Prepetition Secured Lenders in several ways. The Committee addresses each of these restrictions in seriatim, as follows:

### A. Committee Challenge Period

29. The Challenge Period should be extended to August 17, 2011 to permit the Committee to conduct a thorough investigation and, if necessary, commence an adversary proceeding. The proposed challenge period is far too limited, as measured against other Delaware cases. See, e.g., In re AbitibiBowater Inc., Case No. 09-11296 (Bankr. D. Del. June 4, 2009) (providing for 120 days after the formation of the creditors' committee to assert claims and defenses against prepetition lenders); In re Muzak Holdings LLC, Case No. 09-10422 (Bankr. D. Del. Mar. 12, 2009) (providing for 105 days after the formation of the creditors' committee to assert claims and defenses against prepetition lenders); In re Merisant Worldwide Inc., Case No. 09-10059 (Bankr. D. Del. Feb. 13, 2009) (providing for 90 days after the entry of the final order approving postpetition financing to assert claims and defenses against prepetition lenders); In re Fedders N. Am., Inc., Case No. 07-11176 (Bankr. D. Del. Oct. 5, 2007) (providing for 118 days after the entry of the final order approving postpetition financing to assert claims and defenses against prepetition lenders).

30. Pursuant to Local Rule 4001-2(a)(i)(B), parties in interest should typically be given at least 75 days from the date of entry of a financing order, and a creditors' committee at least 60 days from the date of its formation, to investigate the validity, perfection or amount of the secured creditor's prepetition lien. Here, Patriarch seeks an end run around this rule by setting the objection deadline as the earlier of (a) two business days prior to the bid deadline established by an order of the Court or (b) 75 days after the Commencement Date. The proposed bid deadline is July 29, 2011, which would make the objection deadline July 27, 2011, providing the Committee with just 42 days to complete its investigation. Commensurate with the modifications to the Sale Deadlines, the deadline by which the Committee must assert a challenge should be extended so as to provide the Committee with no less than a full 60 days from the date of its formation to assert a challenge against the Prepetition Lenders and their claims, consistent with Local Rules

### B. Post Termination Date Loans

31. It is vital that the Final DIP Order provide for the post Termination Date payment of the Debtors' and Committee's professional fees and expenses, whether such amounts be assured through a traditional carveout or through what the DIP Lender calls a Termination Date Loan. Regardless of its title, it is particularly appropriate for the Court to insist on assurance of payment for the reasonable professional fees and expenses of the debtor's and unsecured creditors committee's counsel and financial advisors to preserve the adversary system. <u>See</u> <u>In re Twenty-Six Realty Associates, L.P.</u>, 1995 WL 170124, *11 (E.D.N.Y. 1995) (carve-out provisions are commonly relied upon to ensure professional representation in bankruptcy adversary proceedings); <u>Evanston Beauty Supply</u>, 136 B.R. 171, 177 (Bankr. N.D. Ill. 1992) (carve-out provisions are viewed as being necessary in order to preserve the balance of the adversary system in reorganization); <u>In re Ames Dept. Stores, Inc.</u>, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (collective rights and expectations of all parties-in-interest in Chapter 11 case are sorely prejudiced absent protection of carve-out for professional fees). Indeed, Judge Walsh, in his April 2, 1998 Open Letter to the Delaware Bankruptcy Bar stated:

> Carveouts for professional fees should not be limited to the debtor's professionals, but should include the professionals employed by any official committee. While the carveout for professionals of any official committee may appropriately exclude work related to the prosecution of an objection to the prepetition secured position of the lender, that exclusion should not encompass any prechallenge investigative work by the professionals. . . . The carveout for committee professionals and the limited period to challenge the lender's prepetition secured position is important. In my view it is the price of admission to the bankruptcy court to obtain the benefits of preserving the assets of the estate.

32. The Final DIP Order provides what is akin to a carveout by permitting the Debtors to borrow funds to pay all accrued but unpaid (and subsequently allowed) professional fees, costs and expenses as of the Termination Date of (i) counsel for the Debtors plus $25,000,

(ii) the Committee's professionals plus $15,000, and (iii) the DIP Lenders' professionals.[12] The DIP Motion should be denied unless the amount of the Termination Date Loan vis-a-vis the Committee is increased to an amount which will permit the Committee to actively engage in this case and protect the interests of general unsecured creditors. In addition, the Final DIP Order should provide that the amount of Termination Date Loans for professional fees is cumulative, and to the extent the Committee and Debtors incur fees during any week in an amount less than that week's budgeted amount, such excess should be available to pay previously or subsequently incurred fees.

### 6. A Section 506(c) Waiver Should Not Be Permitted

33. Under the proposed Final DIP Order, no expenses of administration of the cases or any future proceeding shall be charged against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code. There is no justification for a 506(c) waiver in this case, where the DIP Facility does not provide for the administrative solvency of these estates post- Sale. See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.), 57 F.3d 321, 325 (3d Cir. 1995) ("[S]ection 506(c) is designed to prevent a windfall to the secured creditor ... The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . .") (internal citation omitted); see also In re Codesco, Inc., 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

---

[12] There are certain limits on these "Termination Date Loans:" (i) the aggregate amount of (i) fees and expenses payable to (a) counsel for the Debtors and (b) the Committee's professionals and (ii) United States Trustee fees may not exceed $1.4 million; and (ii) after making such loans, the outstanding balance under the DIP Facility may not exceed the $7 million commitment. See DIP Credit Agreement, §§ 2.1(d) and 3.2(e) and (f). With respect to the latter, this condition precedent should be removed so that the Debtors' and the Committee's professionals' ability to protect their clients' respective rights is protected irrespective of the circumstances.

34. By waiving their rights under section 506(c), the Debtors are agreeing to pay for any and all expenses associated with the preservation and disposition of the collateral of the DIP Lender. Such expenses include all costs that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." Brookfield Prod. Credit Ass'n v. Borron, 738 F.2d 951, 952 (8th Cir. 1984) (citations omitted). Immunizing agreements which prohibit surcharge payment obligations under section 506(c) have been found unenforceable on the basis that such provisions "operate as a windfall to the secured creditor at the expense of administrative claimants." In re Lockwood Corp., 223 B.R. 170 (8th Cir. BAP 1998); see, e.g., In re Motor Coach Indus. Int'l, Inc., Case No. 08-12136 (Bankr. D. Del. Oct. 22, 2008) (Final Order Authorizing Debtors to Obtain Postpetition Financing) [Docket No. 244] (removing a § 506(c) waiver from the final post-petition financing order after the creditors' committee objected to its inclusion); In re Fedders North America, Inc., Case No. 07-11176 (Bankr. D. Del. Oct. 5, 2007) (Final Order Authorizing Debtors to Obtain Postpetition Financing) [Docket No. 272] (same). Because the stalking horse bid of Patriarch does not include **any** cash consideration, the Debtors will never be able to satisfy any claims, administrative or otherwise, that are not covered by the DIP Facility and, therefore, the only circumstance wherein Patriarch should be provided a 506(c) waiver is if they agree to fund all administrative claims of these cases.

### 7. Reimbursement of the DIP Lender's Professional Fees

35. The Debtors are obligated to pay the fees and expenses of the DIP Lender's Professionals. While the Final DIP Order provides the Committee with a right to oppose the reasonableness of those charges, it does not require the DIP Lender's Professionals to provide any detail or time entries regarding the work performed for the DIP Lenders. Given that the DIP Lender's Professionals represent the DIP Lender, the Stalking Horse and the Prepetition Lenders, without the DIP Lender's Professionals' time records providing reasonable detail regarding the tasks performed, it would be impossible for the Committee to confirm that the

payment of such fees and expenses is solely on account of their work for the DIP Lender and not for the Stalking Horse and the Prepetition Lenders. To make certain that the DIP Lender's professional fee expenses are only paid for their work in connection with the DIP Facility and not in their role representing the Prepetition Lenders and /or the Stalking Horse, such professionals should be required to serve the Committee with monthly invoices and time records providing reasonable detail regarding the tasks performed.

## IV.

## **TECHNICAL MODIFICATIONS**

36. In addition the modifications requested herein, the Committee further requests that the following changes be made to the DIP Credit Agreement and Final DIP Order:

- The Committee should receive all reports and other documents required to be provided to the DIP Lender pursuant to Section 5.1(a) of the DIP Credit Agreement.

- The Debtors should not be authorized to enter into any transaction with an insider unless the Committee is provided with no less than ten (10) business days notice of any such transaction.

- The definition of Permitted Budget Variance penalizes the Debtors for performing better than projected when the net cash flow for a week is projected to be negative. The definition of Permitted Budget Variance should be modified so the Actual Net Receipts and Disbursements Amount shall not be less than 90% of the Budgeted Receipts and Disbursements Amount if such amount is projected to be positive and no more than 110% if such amount is projected to be negative for the corresponding period in the Budget.[13]

---

[13] The DIP Credit Agreement requires that the Debtors' Actual Net Receipts and Disbursements Amount be not less than 90% of the Budgeted Receipts and Disbursements Amount for the corresponding period in the Budget. For example, looking at the week ended July 30, 2011, which projects net cash flow of $146,598, the Debtors actual net cash flow must equal no less than $131,938.20 (90%) for the Debtors to be in compliance with the DIP Credit Agreement. However, when the net cash flow for a week is projected to be negative, the permitted variance penalizes the Debtors for outperforming the Budget. Thus, if at the end of the week ended July 2, 2011, which projects the Debtors' net cash flow to equal ($421,547), the Debtors actual net cash flow was 89% of that amount, which amount actually reflects an improvement in the Debtors' performance, the Debtors would be in default.

# V.

## **RESERVATION OF RIGHTS**

37. In the event that any further proposed orders granting the DIP Motion are submitted to the Court prior to the hearing, the Committee reserves all of its rights to object to any and all provisions of such orders.

**WHEREFORE,** the Committee respectfully requests that this Court (i) (a) sustain this Objection; or in the alternative, (b) modify any order authorizing the Debtors to obtain postpetition financing consistent with the requests made by the Committee in this Objection, and (ii) grant such other and further relief as this Court deems just and proper.

Dated: June 28, 2011
       Wilmington, DE

By:   */s/ Julia Klein*
       Frederick B. Rosner, Esq. (DE 3995)
       Julia B. Klein, Esq. (DE 5189)

       THE ROSNER LAW GROUP LLC
       824 N. Market Street, Suite 810
       Wilmington, DE 19801
       Telephone: (302) 777-1111
       Facsimile: (302) 220-1007

       COOLEY LLP
       1114 Avenue of the Americas
       New York, New York 10036
       Telephone: (212) 479-6000
       Facsimile: (212) 479-6275
       Jay R. Indyke
       Jeffrey L. Cohen
       Brent Weisenberg
       Richelle Kalnit

       Proposed Counsel to the Official Committee of Unsecured Creditors