**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

_____
)
In re:                                                  )          Chapter 11 Case
                                                           )
                                                           )          Case No. 11-11733 (KG)
SIGNATURE STYLES, LLC, *et al.*                )
                                                           )          Hearing Date:  June 30, 2011, 3:30 p.m.
                                                           )          Objection Deadline: June 28, 2011, noon
                                 Debtors.            )          (extended for the Committee)
_____)

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION FOR ORDER (I) APPROVING BIDDING PROCEDURES
FOR THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS, (II)
APPROVING CERTAIN BIDDING PROTECTIONS, (III) APPROVING THE
FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
AND (IV) SCHEDULING AN AUCTION AND SALE HEARING**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in

the cases of the above-captioned debtors and debtors-in-possession (the "<u>Debtors</u>") hereby

objects (the "<u>Objection</u>") to the Debtors' Motion for Order (I) Approving Bid Procedures for the

Sale of Substantially all of their Assets, (II) Approving Certain Bidding Protections, (III)

Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of

Executory Contracts and Unexpired Leases and (IV) Scheduling an Auction and Sale Hearing

(the "<u>Bid Procedures Motion</u>"), and, in support of this Objection, the Committee respectfully

states as follows:

<u>**Preliminary Statement**</u>

The Debtors have proposed a mockery of a sale process designed solely to re-vest

Patriarch with substantially all of the Debtors' assets, without meaningfully deleveraging the

company, providing any consideration to the Debtors' estates or a quantum of hope for recovery

by any non-Patriarch creditors. Given that Patriarch is the sole manager of the Debtors, 100%

equity holder, pre-petition lender, proposed DIP lender and proposed stalking horse purchaser,

which acquired the Debtors through an LBO two years ago, the Committee can only surmise that this farce of a sale process for which the Debtors seek approval, is the brain child of Patriarch and its owner, Lynn Tilton.  The Committee cannot sit idly by and permit Patriarch and Ms. Tilton to treat this Court and the Debtors' estates like an inconsequential game of Chutes and Ladders.  The economic impact to be felt by the Debtors' estates and their creditors is too significant to be treated like a child's game and should not be permitted by this Court.  For the reasons stated herein, the Committee respectfully requests that the Bid Procedures Motion be denied.

## Background

1.      On June 6, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code").  The Debtors are presently managing their property and operating their business as a debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      On June 17, 2011, the Committee was appointed and selected Cooley LLP as its counsel and The Rosner Law Group as its co-counsel.  On June 21, 2001, the Committee selected FTI Consulting, Inc. as its financial advisor.

3.      Pursuant to the Bid Procedures Motion, the Debtors seek authorization to establish procedures (the "Bid Procedures") to effectuate a sale of substantially all of their assets (the "Sale").  A primary component of the Bid Procedures is the Debtors' request for approval of an affiliate of Patriarch, as the stalking horse bidder in the sale process, pursuant to the Asset Purchase Agreement filed with the Court (the "Stalking Horse Agreement").

4.      According to the Stalking Horse Agreement, Patriarch proposes to acquire substantially all of the Debtors assets by "assuming" $30 million in debt held by Patriarch, together with the assumption of certain other obligations.[1]  Significantly, Patriarch

---

[1]      Patriarch also agrees to assume liabilities for employee compensation and employee benefits plan, and the Debtors' post-petition obligations to retail customers on account of: (i) returns of merchandise

-2-

would not pay a single dollar in cash consideration for the assets, nor relieve the company from satisfying its purportedly secured indebtedness. Rather, Patriarch merely seeks to roll $30 million of its purportedly secured debt onto the acquiring entity. If approved, the Stalking Horse Agreement would render the Debtors' estates void of any assets that could be used by it to satisfy any claims or any priority, provide any recoveries to general unsecured creditors or, frankly, any consideration at all.[2]

5. The Debtors also seek approval of the Bid Procedures pursuant to which the Sale would be consummated on a highly compressed schedule, as follows:

| Date | Event |
| --- | --- |
| **July 27, 2011** | Objection Deadline for Sale Motion |
| **July 29, 2011** | Bid Deadline |
| **August 1, 2011** | Auction |
| **August 3, 2011** | Sale Hearing |

6. For the reasons set forth herein, the Committee objects to the Bid Procedures Motion, pursuant to which the Debtors seek approval of Bid Procedures inclusive of a Stalking Horse Agreement with Patriarch, which is not capable of being approved by this Court on its existing terms, on a lightning fast-track less than 60 days after the Petition Date.

**Objection**

7. Patriarch caused the Debtors to commence these chapter 11 cases with the sole objective of sliding all of the Debtors' assets from one Patriarch affiliate to another, while shedding itself of unsecured debt that Patriarch allowed the Debtors to incur but doesn't

---

purchased after the Petition Date, (ii) merchandise orders made after the Petition Date to the extent not fulfilled as of the closing, and (iii) gift cards purchased after the Petition Date. Patriarch also agrees to honor certain customer gift cards and merchandise credits, accrued pre-petition.

[2] Moreover, this proposed structure appears to be designed to avoid the Bankruptcy Code's plan requirements relative to the heightened standard for releases (purchasing claims against Patriarch instead of releasing them) and relative to the Debtors' burden to prove they are unlikely to end up in chapter 11 again, or chapter 7. Indeed, a delayed subsequent filing is possible in light of the Debtors' failure to deleverage their secured debt through the Sale.

-3-

want to pay. In furtherance of this goal, Patriarch has caused the Debtors to propose a sale process that virtually assures that Patriarch will emerge as the winning bidder, notwithstanding the fact that Patriarch would not be required to pay a single dollar in cash consideration to the Debtors' estates, does not provide for the administrative solvency of these estates and preordains unsecured creditors to a zero recovery.

8.	It is not surprising that the Debtors favor Patriarch in the sale process because Patriarch completely dominates the Debtors and, upon information and belief, directs each and every one of their decisions for its own benefit. An affiliate of Patriarch Partners Agency Services, LLC ("Patriarch") acquired the Debtors approximately 2 years ago in a foreclosure sale. The transaction was structured as a leveraged buyout which, at the time, saddled the Debtors with in excess of $21 million of purportedly secured debt. Patriarch affiliates are also acting as the Debtors' prepetition lender, 100% equity holder, and DIP lender. Lynn Tilton, who owns Patriarch, is the sole member of the Debtors' board of manager, and it was Patriarch who hired the Debtors' recently employed executive management, chief restructuring officer and, on the eve of bankruptcy, investment banker.

9.	Now, Patriarch asks this Court to approve Bid Procedures wherein an affiliate of Patriarch will act as the stalking horse bidder. The proposed procedures are a sham, designed to culminate in the transfer of all of the Debtors' assets from one Patriarch affiliate to another, without any material benefit to the Debtors. This level of self-dealing and the comical terms of the Stalking Horse Agreement, preclude a finding that the Sale is proposed in good faith or beneficial to the Debtors' estates and, therefore, preclude any finding that there is any reasonable business justification for the Bid Procedures.

10.	Under the Stalking Horse Agreement, Patriarch provides no cash consideration to the Debtors' estates. Rather, it proposes to "assume" certain of the Debtors' debt and other obligations, comprised primarily of $30 million in pre- and post-petition obligations to the Debtors' lenders (all of whom are affiliates of Patriarch). In reality, Patriarch is

-4-

offering to do no more than roll its own debt from the existing operating company, to a new operating company, while shedding itself of the obligation to pay any of its non-Patriarch creditors. This accounting sleight of hand does not benefit the Debtors' estates, which will remain insolvent, or their creditors, who will receive nothing. It benefits Patriarch alone, who will be permitted to acquire the Debtors' assets cleansed of unsecured debt, while at the same time allowing Patriarch to grant itself releases from causes of action currently held by the Debtors' estates and cause the Debtors to execute certain beneficial chapter 11 strategies like rejecting undesirable executory contracts and unexpired leases, including the lease for their distribution center.

11.     If the Debtors were to close the Sale on the terms of the Stalking Horse Agreement, the Debtors would still owe their pre- and post-petition lenders approximately $10 million, which obligations presumably would not be paid since Patriarch will have bought all of the Debtors' assets without any cash consideration. From the perspective of the Debtors and their creditors, this is the only actual "value" of the Sale. Patriarch is, in effect, "credit bidding" $10 million of debt for substantially all of the Debtors' assets. Of course, this "debt" remains subject to investigation and challenge by the Committee, and may constitute nothing more than an unsecured claim or equity interest in these cases.

12.     Not satisfied with merely fleecing the Debtors, it appears the sale process has been designed to discourage third-party interest in the Assets. First, the Bid Procedures include certain extraordinary provisions which guarantee an uneven playing field tipped in the favor of Patriarch. For example, the Bid Procedures prohibit competing bidders from proposing the assumption of any of the Debtors' pre- and post-petition loan obligations. Further, the Bid Procedures provide that if other bidders propose to include any "non-cash consideration," such consideration "must be, in the reasonable discretion of the Debtors, freely marketable." This requirement would preclude other bidders from including any assumed liabilities as part of their consideration. Together, these provisions give Patriarch an unfair and unwarranted advantage

-5-

over other bidders, and will chill competing bids, notwithstanding the fact that Patriarch's $10 million credit bid will provide meager, if any, value for the Debtors' assets.

13.     Moreover, the Debtors stopped honoring their customer programs on the Petition Date, and have not implemented any critical vendor or 503(b)(9) payment programs to ensure continued support of their vendors and trade partners. This course of conduct is highly detrimental to the value of the Debtors' business as a going concern, and can only be explained by Patriarch's desire to make the assets appear less attractive to potential competing bidders.

14.     In addition to all of the flaws of the Stalking Horse Agreement identified above, one major incurable deficiency remains. Patriarch's entire offer of a fictional credit bid is premised upon the extent, validity and priority of its purportedly secured indebtedness. As of the date hereof, no claim by Patriarch has been allowed in these chapter 11 cases, and the Committee has had no opportunity to investigate the validity of Patriarch's prepetition loans and the liens which purportedly secure them. Given that such claims arise from a leveraged buyout no more than 2 years ago and subsequent infusions of working capital from Patriarch, who at all times has been the sole manager and 100% equity holder of the Debtors, an allowed secured claim is far from certain for Patriarch in these cases. Of course, the brevity of the proposed sale process is at least partially designed to deprive the Committee of a fulsome opportunity to scrutinize the Patriarch debt. The Committee strongly believes that this Court should not permit Patriarch to race through these cases, simply to avoid meaningful scrutiny.

I.     **The Court Should Not Approve the Bid Procedures and the Sale**

15.     The proposed Bid Procedures and Stalking Horse Agreement should not be approved for several reasons. First, given Patriarch's total control of the Debtors, the Bid Procedures and Stalking Horse Agreement were not the product of arms' length negotiation. Rather, their terms were dictated by Patriarch and Lynn Tilton. Second, the Stalking Horse Agreement cannot qualify as a "good faith" transaction, because it is designed to benefit the purchaser while providing no benefit to the Debtors and their estates. Third, there is no

1730530 v4/NY

reasonable business justification for the proposed Stalking Horse Agreement and Bid Procedures, which would benefit only Patriarch. Finally, the hurried process by which the Debtors seek to effect the Sale is unreasonable and unfairly favors Patriarch.

16.     The Bid Procedures cannot satisfy the applicable standard under section 363(b) of the Bankruptcy Code. *In re Encore Healthcare Assoc.*, 312 B.R. 52, 57-58 (Bankr. E.D. Pa. 2004) (holding that, ". . . at this junction the Debtor has only requested that I approve the sale procedures and not the sale which would be conducted pursuant to those procedures, since I will not approve a sale under any procedures, it would be improper to authorize this first step").

17.     To permit a chapter 11 debtor to effect a sale of assets outside the ordinary course of its business, a bankruptcy court must specifically find that such sale would be in the best interests of the creditors of the Debtors' estates. *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). As such, it is incumbent upon the court, in connection with a section 363 sale, to ensure that "optimal value is realized by the estate." *In re Lahijani*, 325 B.R. 282, 288 (9th Cir. BAP 2005). Especially where, as here, the proposed purchaser is an insider of the Debtors and controls the Debtors in every conceivable way, the court must give heightened scrutiny to the proposed transaction. *See In re Summit Global Logistics, Inc.*, No. 08-11566, 2008 WL 819934, * 9 (Bankr. D.N.J. Mar. 26, 2008) ("The Debtors bear the burden of proving that they have satisfied the … heightened scrutiny required by non-bankruptcy law for insider transactions."); *cf. Weinberger v. UOP Inc.*, 457 A.2d 701 (Del. 1983) (in a non-bankruptcy setting, party to transaction has burden to show "entire fairness", which requires a showing of fair dealing (when the transaction was timed and how it was initiated, structured, negotiated and disclosed) and fair price (economic and financial considerations of the transaction)); *see also Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003) (holding that sale of substantially all assets outside reorganizing plan is subject to close scrutiny

-7-

by creditors and the Court); *In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004) (same).[3]

18.     In order for a bankruptcy court to approve a sale, the Bankruptcy Code requires a debtor to demonstrate: (i) that the proposed transaction was entered into in good faith; (ii) that there is a reasonable business justification for the sale; and (iii) that the sale will result in a fair value being paid to the debtor. *In re Abbotts Dairies of PA, Inc.*, 788 F.2d 143, 147-50 (3d Cir. 1986); *In re Timberline Prop. Dev., Inc.*, 115 B.R. 787, 790 (Bankr. D. N.J. 1990).  Because it is not possible for the Debtors to satisfy these requirements on the terms of the Stalking Horse Agreement, approval of the Bid Procedures is a waste of this Court's time and the limited resources of these estates.

**A.      Debtors have not Demonstrated that Patriarch is a "Good Faith" Purchaser**

19.     It is impossible to characterize the proposed Sale and Bid Procedures as arms' length transactions between the Debtors and Patriarch.   Patriarch dominated and controlled every aspect of the Debtors' business during the course of the "negotiation" of the terms of Stalking Horse Agreement and the Bid Procedures.  Not surprisingly, the resulting sale terms and Bid Procedures are completely one-sided in favor of Patriarch.

20.     It is well-settled that ". . . when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser."  *In re Abbotts Dairies of PA, Inc.*, 788 F.2d at 149-50; *see also In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988) (same); *In re Indus. Valley Refrg. and Air Cond. Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987) (same).  In this case, Patriarch's

---

[3] *See also Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005); *In re Med. Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002) (when transactions benefit insiders, "the purchaser [of the asset] has a heightened responsibility to show that the sale is proposed in good faith and for fair value"); *In re Firstmark Corp.*, 46 F.3d 653, 656 (7th Cir. 1995) ("…a sale of a debtor's property to an insider is subject to close scrutiny."); *In re Ozark Restaurant Equipment Co., Inc.,* 850 F.2d 342, 345 (8th Cir. 1988) (sales arranged by insiders must be given close scrutiny); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (transactions with insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse").

1730530 v4/NY

connections with, and control over, the Debtors demonstrate that the proposed Sale is a collusive enterprise which precludes a good faith finding.

21.     Moreover, the Debtors owe fiduciary duties to their creditors.  *In re Schipper*, 109 B.R. 832, 835 (Bankr. N.D. Ill. 1989) (holding that chapter 11 debtor is fiduciary of creditors and estate and therefore must refrain from self-dealing); *In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (holding that in connection with asset sale in bankruptcy, fiduciary duty of officers and directors of debtor runs to creditors).  The Bid Procedures make it impossible for the Debtors to fulfill these duties.  Because Patriarch is engaged in self-dealing, it is incentivized to obtain the assets for the lowest possible price, a result in which is manifestly antithetical to the interests of the Debtors' estates and creditors.

22.     Accordingly, the requirement of good faith cannot be satisfied in this instance.  *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (holding that good faith of purchaser is lost by collusion between purchaser and trustee); *Indus. Valley*, 77 B.R. at 22 (holding that sale could not be approved given absence of good faith where insider of debtor colluded with purchaser resulting in reduction in purchase price); *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 837-38 (Bankr. E.D. Va. 1997) (holding that proposed sale could not satisfy good faith standard where purchasers were insiders of debtor).

**B.     There is no Reasonable Business Justification for the Bid Procedures and Stalking Horse Agreement, as Proposed by the Debtors**

23.     A sale outside the ordinary course of a debtor's business will be approved only if a good business justification supports it.  *Gucci*, 126 F.3d at 385; *see also In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989) (holding that 363(b) sale requires a sound business reason justifying the sale and a finding that the purchase price is fair and reasonable).

24.     There is no adequate business justification for the proposed Sale, on the terms of the Stalking Horse Agreement, because it will impart no benefit to the Debtors' estates

1730530 v4/NY

or creditors. Rather, the entire benefit will be to Patriarch, leaving creditors of any priority, including general unsecured creditors, with zero recovery. *See, e.g., In re Crutcher Resources Corp.*, 72 B.R. 628, 633 (Bankr. N.D. Tex. 1987) (holding that no adequate business justification for sale existed where, as here, sale would benefit only certain creditors and parent of debtor, and where sale would prevent reorganization and destroy and possibility of payments to unsecured creditors). *Encore Healthcare*, 312 B.R. at 53 (". . . there must be some business justification, other than appeasement of major creditors, before the bankruptcy judge may order such disposition under § 363(b)."); *In re Embrace Systems Corp.*, 178 B.R. 112, 123-24 (Bankr. W.D. Mich. 1995) (holding that no sufficient business justification was shown for sale where, as here, buyer had collusive connections with debtor, assets were bulk of the estate, bankruptcy proceedings were only four months old and sale would not advance goal of reorganization).

25.     The Committee understands that the Debtors may argue that they merely seek procedural relief to establish sale procedures, and not the substantive relief to approve the Sale itself. Such an argument is wholly without merit and was squarely addressed and dismissed by the *Encore Healthcare* bankruptcy court:

> While I recognize that at this junction the Debtor has only requested that I approve the sale procedures and not the sale which would be conducted pursuant to those procedures, since I will not approve a sale under any procedures, it would be improper to authorize this first step.

312 B.R. at 57. Patriarch should not be permitted to exploit the chapter 11 process for its sole benefit, by cleansing the assets and transferring them to one of its affiliates, while fleecing the Debtors' estates and leaving all non-Patriarch creditors in its wake.

### 1.     The Expedited Timing of the Bid Procedures is Unreasonable

26.     It is abundantly clear that the Debtors failed to generate any meaningful interest in acquiring the assets from third parties prior to the Petition Date. *See In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 221 (Bankr. N.D. Ohio 1994) (holding that sale would not be approved where, as here, there had been a lack of effort soliciting competing offers and no

-10-

advertising). Contrary to the Debtors' assertion, there was no meaningful prepetition marketing of the assets, a fact belied by the fact that the Debtors only retained an investment banker 5 days before they filed these cases. Moreover, they tasked this investment banker with marketing the Debtors' assets by using a confidential information memorandum, prepared by its recently retained executive management, who had limited incentive, time and knowledge to prepare such important materials.

27.     The Bid Procedures contemplate the sale of the Debtors' assets to an insider pursuant to a process that will be completed less than two months after the Petition Date. This compressed schedule would make it impossible to attract competing bidders or to subject the assets to a meaningful "market check."

28.     Moreover, the Committee was only recently appointed and has not had any opportunity to evaluate the true value of the Assets. Nor has the Committee had an opportunity to evaluate Patriarch's loan or lien positions, or to investigate Patriarch prepetition transactions with the Debtors. Accordingly, the time table imposed under the Bid Procedures must be extended so as to permit the Committee to fulfill its statutory obligations.

29.     For all of these reasons, the Bid Procedures and the hurried schedule they require cannot be justified. *See In re The Bombay Co., Inc.*, 2007 Bankr. Lexis 3218, *8 (Bankr. N.D. Tex. September 26, 2007) ("if section 363(b)(1) is the means for effecting a debtor's disposition, the creditors should have the luxury of enough time for their representatives to assess the fully proposed transaction"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value of the estate.").

## 2.     The Bid Procedures Unfairly Favor Patriarch

30.     The Patriarch bid is styled as the "assumption" of $30 million in debt. However, as described above, the actual, limited value of this bid to the Debtors' estates consists of $10 million in debt that would, in effect, be forgiven. The Bid Procedures would

-11-

require any competing bidder to offer "a proposed purchase price greater than the aggregate consideration" offered by Patriarch, while prohibiting competing bidders from offering to assume any of Patriarch's debt. Together, these provisions give Patriarch a blocking position in excess of $30 million, despite the fact that real value of the Patriarch bid is $10 million.

31.     Moreover, Patriarch has caused the Debtors to diminish the going-concern value of the assets by, among other things, halting the Debtors' customer programs and failing to adopt any critical vendor initiatives, steps clearly designed to make the assets less attractive to competing bidders.

32.     Finally, the Bid Procedures require the Debtors to "consult with" the Debtors' pre- and post-petition lenders (*i.e.,* Patriarch) "to the same extent [they are] required to consult with the Committee". This provision is manifestly improper given Patriarch's role as the stalking horse bidder, giving Patriarch an enormous advantage over other bidders.

## II.     If the Court Determines that a Sale is Advisable, Modifications Must be Made to the Proposed Bid Procedures and Terms of the Stalking Horse Agreement

33.     Even if the Court determines that the Stalking Horse Agreement and Bid Procedures satisfy the "good faith" and "business justification" standards of section 363(b) of the Bankruptcy Code, the proposed Bid Procedures should not be approved in their present form. At a minimum, for the reasons discussed above, the Bid Procedures and the terms of the Sale must be modified as follows:

- The bid deadline should be extended to at least 90 days following the Petition Date. Otherwise, bidding will be chilled because interested parties will not have a sufficient opportunity to investigate the value of the Debtors' assets or to formulate bids.

- The Bid Procedures should be modified so as to require the consent of the Committee in all phases of the sale process, including solicitation of competing bids, qualification of bidders, evaluation of competing bids, the conduct of the auction and the selection of the winning bidder. To this end, the Committee has recently filed a motion for an order (a) authorizing its financial advisor to supplement the sale process and solicit alternative proposals using, inter alia, the debtors' confidential information, (b) directing the Debtors to provide cooperation in connection with such efforts, and (c) authorizing and directing the Debtors to maintain

1730530 v4/NY

and administer customer programs and honor prepetition obligations related thereto in the ordinary course.

- The requirement that the Debtors consult with Patriarch should be stricken from the Bid Procedures.

- The Bid Procedures must expressly provide that Patriarch may not assume its own prepetition debt or otherwise "credit bid" for the Assets unless the Committee and Debtors agree, or unless it is adjudicated by the Bankruptcy Court, that Patriarch has an allowed claim in the amount of its assumed debt or its credit bid, fully secured by a valid, proper, perfected lien on the Debtors' assets, not subject to equitable subordination or recharacterization.

- Patriarch should be required to pay in cash an amount sufficient to satisfy all administrative expense claims and 503(b)(9) claims, and to fund a wind-down budget for the Debtors' estates. Patriarch should not be allowed to use the chapter 11 process for its sole benefit without providing any benefit to the Debtors' estates.

- Any restrictions or prohibitions intended to limit the type, character or amounts of consideration to be offered by a competing bidder should be eliminated, to encourage an open bidding process with an even playing field. Otherwise, Patriarch will enjoy an unfair advantage in the bidding process that all but assures it will emerge as the winning bidder.

- The Bid Procedures should clearly indicate that bids will be entertained for any or all of the Debtors' assets, and the Debtors' discrete business segments should be separately exposed to the market so as to maximize value. Absent such separate marketing, bidding will be chilled because bidders who are interested in less than the Debtors' entire business will be locked out of the process.

- The Bid Procedures should clarify that the expense reimbursement provided for therein will only be payable to the extent that it is not duplicative of the expense reimbursement provided for in the DIP credit agreement. Further, the Committee should be provided with copies of invoices for Patriarch's legal and other expenses before they are paid.

- To the extent purchase consideration includes the assumption of both prepetition and DIP obligations, Patriarch should be required to allocate these assumed liabilities first to the DIP obligations. Patriarch should not be permitted to extinguish its prepetition loans, while leaving the Debtors' estates encumbered by the superpriority administrative expense claims provided for in the DIP facility.

- Patriarch should be required to commit up front to the assumption of a specific group of executory contracts and unexpired leases. The Stalking Horse Agreement now permits Patriarch to add or remove contracts and leases from the assets at any time prior to closing, making it impossible

-13-

1730530 v4/NY

to quantify the economic impact of the Sale to the Debtors' estates, or to compare the Patriarch bid to competing bids.

- Causes of action against Patriarch should be removed from the assets subject to the Sale. These claims should not be effectively extinguished, especially at this early stage of the cases when the Committee has not even begun its investigation of Patriarch's prepetition transactions with the Debtors.

WHEREFORE, the Committee respectfully requests that the Court deny the relief requested in the Bid Procedures Motion.  In the alternative, the Committee respectfully requests that the Court modify the Bid Procedures and the terms of the Sale as provided herein.

Dated:  June 28, 2011
        Wilmington, Delaware

Respectfully submitted,

**THE ROSNER LAW GROUP LLC**

*/s/ Julia Klein*
Frederick B. Rosner (DE 3995)
Julia B. Klein (DE 5189)
824 Market Street, Suite 810
Wilmington, DE 19801
Tel.: (302) 777-1111
rosner@teamrosner.com
klein@teamrosner.com

-and-

**COOLEY LLP**
1114 Avenue of the Americas
New York, New York 10036
Tel.: (212) 479-6000
Jay R. Indyke
Jeffrey L. Cohen
Richelle Kalnit

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

1730530 v4/NY